[Civ. No. 3726.   Second Appellate District, Division One.—November 29, 1921.]

CHARLOTTE FINKLE, as Administratrix, etc., Appellant, v. MRS. JESSIE TAIT et al., Respondents.

[1] NEGLIGENCE—DEATH OF PEDESTRIAN—COLLISION WITH AUTOMOBILE —EVIDENCE—DIRECTED VERDICT.—In this action for damages for the death of a pedestrian from a collision with an automobile, the direction to the jury to return a verdict for the defendant was warranted by the evidence.

[2] TRIAL—DIRECTED VERDICT—WHEN PROPER.—If upon the conclusion of the taking of the evidence it appears to a trial judge that a case for the plaintiff has not been made out, it is his duty to direct a verdict unless it reasonably appears that, upon another trial, the plaintiff may be able to secure better evidence.

[3] NEGLIGENCE—PEDESTRIAN CROSSING STREET—EXERCISE OF CARE.— It is the duty of a pedestrian in crossing a city street to use such reasonable care as the conditions demand to see passing vehicles and avoid colliding with them.  (Supreme court on denial of hearing.)

APPEAL from a judgment of the Superior Court of Los Angeles County.  Charles Monroe, Judge.  Affirmed.

The facts are stated in the opinion of the court.

Turnbull, Heffron & Kelley for Appellant.

Chandler P. Ward and Stephens & Stephens for Respondents.

JAMES, J.—The husband of Charlotte Finkle was struck by an automobile which was being operated by Georgia Tait, receiving injuries from which he died almost immediately.  The administratrix of his estate brought this action to recover damages, alleging that the automobile which caused the death of Finkle was at the time being operated in a negligent manner and at a dangerous and excessive rate of speed.  After hearing the testimony of the witnesses for plaintiff and defendants, the trial judge advised the jury to return a verdict in favor of the defendants,

3.  Rights and duties of pedestrians in highways with respect to automobiles, note, 4 Ann. Cas. 400.

which verdict was thereafter recorded and judgment entered thereon. The plaintiff has appealed and the question presented is as to whether the action of the trial court in requiring the verdict to be rendered as indicated was error. It is insisted that there was substantial evidence tending to show negligence on the part of the operator of the automobile and that the evidence did not show that the injuries received by Finkle were produced or contributed to by any careless or incautious conduct on his part. The position of the defendants as contended for is that the evidence failed to establish negligence on the part of the driver and did show that the accident was produced through the contributory negligence of Finkle. Mrs. Jessie Tait is the mother of Georgia Tait, and it was admitted that she would be legally responsible for any damage which might be shown to have been caused by her daughter Georgia through the operation of the automobile which collided with Finkle. For convenience we will hereinafter, when discussing the evidence affecting the operation of the automobile, refer to Georgia Tait as though she were sole defendant.

Hollywood Boulevard, in the city of Los Angeles, is a wide street extending in an easterly and westerly direction. On the northerly side of it Ivor Street emerges, but is not cut through the southerly line of the boulevard. The accident happened at a point on Hollywood Boulevard on the southerly side thereof, and about in the space which would be occupied by the westerly sidewalk of Ivor Street had it been projected across the boulevard. The testimony of Georgia Tait, who was operating the car on the night in question, shows that on the twenty-sixth day of November, 1919, at about the hour of 5:30 or 6 o'clock P. M., she was driving a touring car, accompanied by a young lady friend, easterly along Hollywood Boulevard; that she was on the right-hand side of the street between the car tracks and the curb; that it had been raining that afternoon and that portions of the street were dry and portions wet; that it was fairly dark; that her car was equipped with headlights of usual character, and that they were lighted. The witness stated, in answer to a question, that the headlights illuminated the street ahead of her car for more than ten feet. In that connection she said: "I know that my head-

lights were very good, and I could see a great distance";
that she had, after crossing a street at the westward of
the point where the accident occurred, shifted her machine
into high gear, and that she noticed ahead of her a white
object which was shown to be a box carried upon the
shoulders of Finkle; that at the time she saw the man and
box they were directly in front of her machine and that
almost at the same instant the automobile struck the man.
The witness said: "It was just a second before I hit him."
In order to show what attention the driver of the auto-
mobile was giving to the roadway ahead of her, the wit-
ness was asked as to whether she looked down at the time
she shifted gears, and replied that she did not; that she
made the shift, as she was accustomed to do, without look-
ing down. She further made replies to questions asked as
follows: "A. I looked up and the first thing I saw was
this great white object. Q. You looked up from where?
A. I looked ahead of me and this great white object was
in front of me. Q. Were you looking somewhere else be-
fore you looked up? A. No, but it was very dark, and it
just seemed that he appeared right in front of my car."
The witness further stated that she had driven the auto-
mobile since January of 1919, which was a period of more
than ten months preceding the day of the accident; that
she was accustomed to drive in the dark and that she was
the only member of her family who operated the machine.
She stated further that immediately after the automobile
collided with Finkle she threw on both brakes and brought
the car to a standstill within a space not exceeding its
length; that at the suggestion of a bystander who had
arrived to assist, she drove the car forward and to the curb
about a hundred feet and remained there until she was
again told to back the car up where the injured man was,
when he was placed in the car and taken to a place where
medical help was obtained. She further stated that at the
time the accident occurred her machine was traveling at
a rate of speed between twelve and fifteen miles per hour.
The witness Constance Rimpau, who was riding with Georgia
Tait at the time of the accident, corroborated the driver's
statement as to all of the circumstances testified to by the
latter. No other witness was produced who saw Finkle on
the street at that place before he was struck by the auto-

mobile, so that, except for the testimony of the young
women, the court was not advised as to what the actions of,
Finkle had been up to the moment when the automobile
collided with him. All of the other testimony, as referring
to the immediate occurrence, illustrates only what certain
witnesses saw after their attention had been attracted to
the point upon hearing the sound of the collision between
the automobile and the man and box. Taking the case as
its facts were illustrated by the testimony of the two young
women alone, it must at once be apparent that not only
was there a failure on the part of the plaintiff to estab-
lish the negligence of the driver of the automobile, but that
such testimony showed in an affirmative manner that the
machine was being operated with reasonable caution. Nor
are we able to find, summing up all of the circumstances
shown by the testimony of those who observed the situation
after the accident, that the jury, had the case been sub-
mitted to it, would have been authorized to draw an in-
ference of negligence as against the defendant., Gorham
and McKelvey were two witnesses who made certain obser-
vations from points across the street after they heard the
noise of the collision. The claim is made that, from testi-
mony of these two witnesses particularly, supplemented by
that of a witness Page, who made certain measurements, to
which we will later refer, the jury would have been en-
titled to infer that the automobile did not come to a stop
after the collision with Finkle until it had traveled ap-
proximately one hundred feet easterly. Neither of the
first-named two witnesses testified that the automobile did
not stop, as the driver and her companion had stated it
did, before proceeding onward and to the curb. Gorham
was on the opposite side of the street and he said that,
after hearing the noise of the collision and seeing a box
flying in the air, he heard the brakes go on squeaking and
"heard the skidding process of the machine that I sup-
posed hit him, which proved later to be the one." He
stated, however, that when he saw the automobile in ques-
tion it was approximately one hundred feet from where the
man was lying. McKelvey was at another point diagonally
across the street when he heard the noise of the collision
and, looking across, saw the man and box fall. He testified
in part as follows, referring to the automobile: "Q. Did

you see it before it came to a stop? A. I seen it while it was running; yes. Q. Did you see it after it came to a stop? A. Yes, sir. I seen it pull over to the curb. I seen the tail light. It was about a hundred or a hundred and twenty-five feet from where the man was lying when it stopped.'' Contrary to the observation of Gorham, this witness, when asked the question, stated that he did not hear any noise of scraping of brakes. Page, a police officer who arrived just as the injured man was being taken away, testified that he noticed ''skid'' marks which showed on the street, commencing at what would be the east line of Ivor Street if the same were produced across Hollywood Boulevard, nine feet from the south curb of the boulevard and extending for a distance of sixty-five feet east and to the curb. This question was asked and answer made: ''Q. These skid marks ran parallel one with the other? A. Yes, sir, they swerved a little to one side.'' By all the testimony it appeared that the collision occurred at what would be the west line of Ivor Street, and from the diagram shown in the record the width of Ivor Street appears to have been thirty-three feet; hence the so-called ''skid'' marks did not commence until the automobile had gone thirty-five feet past the point of the accident. The evidence of these conditions, to our mind, in nowise presented a substantial conflict as to the facts in opposition to the testimony of the two occupants of the automobile. Without some informative evidence as to the conditions under which the automobile in question might make marks which the witnesses term ''skid tracks,'' we can attach no significance to that testimony. It might as well be inferred that the driver had allowed her brakes to make contact while she proceeded to conduct the automobile to the curb after the accident, as to infer that the marks were due to an opposite cause, to wit, the resistance offered by the application of brakes to the momentum of the machine; and if the latter is to be assumed, there is utterly no means by which the rate of speed can be deduced from the fact. To add to the factors which would have to be taken into consideration, is the wet and dry condition of the street, the evidence being that the surface was damp and slippery in spots. The evidence showed that there was considerable traffic to and fro on either side of Hollywood Boulevard at the

time the accident happened, and approximately two-thirds of the width of the street intervened between the points from which the observations of Gorham and McKelvey were made and the place of the accident. The statements of these witnesses as to the automobile having moved forward after the noise of the impact was heard by them were wholly consistent with the statements of the driver and her companion. An inference that they observed closely enough to be able to know that the automobile did not, in fact, stop immediately after the collision, and intended to so express themselves, would be speculative. The trial judge, we may conclude from oral observations made during the argument of counsel on the question as to whether an instruction to the jury to find for the defendant was proper, was of the opinion that Finkle had been shown to have been guilty of negligence on his part, which contributed to produce his injuries. If the judgment to be determined upon here depended upon the correctness of that view, we would not be inclined to agree with the trial judge's conclusion, but we are required to determine whether the instruction was proper to be given under any aspect of the evidence. In reaching the opinion indicated on the question of contributory negligence, the judge was undoubtedly making application of decisions which we do not believe were appropriate to the situation here. Those decisions are more particularly applicable to cases where a person is approaching a situation which threatens danger to him, and where it is easy to apprise himself of the danger by looking. It will be presumed in such circumstances, upon injury being received by him, that he did not look and was hence negligent. We think here that before any inference of negligence could be drawn as against the injured party, the whole situation as to the condition of the street traffic, number of vehicles passing, and the actual movements of Finkle, would necessarily have to be illustrated in the evidence. In a congested condition of traffic a person might, without negligence, get himself into a position of great danger. If he acted in the emergency of the situation as a reasonable man might, then such conduct would not bar recovery where negligence was proved against the driver of an automobile colliding with him. **[1]** From all that can be gleaned from the record presented to us, we

are unable to conclude that the evidence produced before the trial judge and jury established either negligence on the part of the driver of the automobile or of Finkle, now deceased. A trial by jury, under the practice established in this state, does not mean that the party calling for the jury has the right to its verdict irrespective of any control on the part of the trial judge. On the contrary, the jury's determination as to questions of fact, when made, is no more conclusive upon a trial court as against motions for a new trial than are the findings of the trial judge where the case is tried without a jury. It is not only the right, but it is the duty, of the trial judge to grant a new trial whenever he is of the opinion that the verdict of the jury or his own findings of fact are not sustained by the weight of the evidence. (Sec. 2061, Code Civ. Proc.; *Drathman* v. *Cohen et al.,* 139 Cal. 310 [73 Pac. 181]; *In re Martin,* 113 Cal. 479 [54 Pac. 813]; *Weringer* v. *Rutledge,* 180 Cal. 566 [182 Pac. 31].) **[2]** And if, upon the conclusion of the taking of the evidence, it appears to a trial judge that a case for the plaintiff has not been made out, it is likewise his duty to give direction for a verdict unless it reasonably appears that, upon another trial, the plaintiff may be able to secure better evidence. In the case of *Lacey* v. *Porter,* 103 Cal. 597 [37 Pac. 635], the court was considering the claim of error for the giving of an instruction similar to that shown to have been given in this case, and it was there said: "The general rule undoubtedly is that these questions should be submitted to the jury where the evidence is conflicting; but it is equally well settled that the court may within certain limits control the verdict, either by such an instruction as was here given, or by setting it aside and granting a new trial, either upon motion of the defeated party or upon its own motion. To justify the court in directing a verdict it is not necessary that there should be no conflict in the evidence; but where the evidence is such that it is clearly insufficient to support a verdict in favor of the party against whom the direction is given, the instruction is proper, unless the circumstances of the case indicate that upon another trial the evidence may be materially different, in which case the facts should be submitted to the jury in order that a new trial may be had. But in either case the decision of the

court below will be sustained, unless the appellate court can clearly see that its conclusion is wrong upon the facts." Again, in *Jacobson* v. *Northwestern Pac. R. R. Co.,* 175 Cal. 468 [166 Pac. 3], the court said, quoting from the *Estate of Baldwin,* 162 Cal. 471 [123 Pac. 267] : "To warrant a court in directing a verdict, it is not necessary that there should be an absence of conflict in the evidence, but, to deprive the court of the right to exercise this power, if there be a conflict, it must be a substantial one." (See, also, *Diamond* v. *Weyerhaeuser,* 178 Cal. 540 [174 Pac. 38] ; *Davis* v. *California St. C. R. R. Co.,* 105 Cal. 131 [38 Pac. 647] ; *Stephenson* v. *Southern Pac. Co.,* 102 Cal. 143 [34 Pac. 618, 36 Pac. 407] ; *Kalish* v. *White,* 36 Cal. App. 604 [173 Pac. 494].) No conditions are indicated from all that is disclosed by the record before us, that upon another trial the evidence would be different.

The judgment is affirmed.

Conrey, P. J., and Shaw, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 26, 1922, and the following opinion then rendered thereon:

THE COURT.—The petition for a rehearing of this cause in the supreme court is denied.

We deem it proper to say that, upon looking into the evidence in the record, we are of the opinion that the direction to the jury to return a verdict for the defendant was warranted on the ground that the negligence of the decedent, Nathan Finkle, was a proximate cause of the collision with the defendant's automobile. It occurred after dark on a public street; the headlights of the automobile were lighted and would have been plainly visible to him if he had looked. The automobile was going at a speed not exceeding fifteen miles an hour. [3] He was crossing the street at the time and it was a part of his duty to use such reasonable ordinary care as the conditions demanded to see passing vehicles and avoid colliding with them. (*Niosi* v. *Empire Steam Laundry,* 117 Cal. 260 [49 Pac. 185] ; *Scott* v. *San Bernardino etc. Co.,* 152 Cal. 610 [93 Pac. 677].) A failure

by him to exercise such ordinary care would be negligence on his part. The only evidence on the subject shows that the headlight was in good order and that it was clearly visible at a considerable distance. It follows, therefore, that he either failed to take the trouble to look for automobiles on that side of the street as he crossed, or that he saw the automobile and carelessly walked in front of it. There was evidence that he was carrying a box of raisins twenty-three inches long, thirteen inches wide, and ten inches thick on his shoulder in such a position that it may have obscured his vision. If that was the case, then it was negligence for him to attempt to cross the street with his vision obstructed in that manner. Hence, under either theory as to his conduct, he failed to use due care, and that failure was one of the proximate causes, if not the only one, of his injury and death.

Shaw, C. J., Lennon, J., Shurtleff, J., Waste, J., Wilbur, J., Lawlor, J., and Sloane, J., concurred.