[Civ. No. 5626. Third Appellate District.—July 9, 1936.]

In the Matter of the Estate of FRANK SMETHURST, Deceased. RAYMOND M. SMETHURST et al., Appellants, v. CHARLES W. SMETHURST et al., Respondents.

M. B. Moore and Ivan Sperbeck for Appellants.

Richard Belcher and Homer Lingenfelter for Respondents.

THE COURT.—An order was made admitting the will of Frank A. Smethurst to probate notwithstanding the verdict of the jury in favor of contestants who claimed that at the time the will was executed, the testator was insane. This appeal is from that order and the judgment based thereon.

The testator, Frank A. Smethurst, was unmarried, sixty-two years of age, and in infancy had suffered an injury resulting in a curvature of the spine, which had left him

physically handicapped, and with increasing years morose, quarrelsome and more and more inclined to seek relief in an excessive use of intoxicating liquor. He died from the effects of strychnine taken with suicidal intent, some two months after the drafting of the will, which was executed on May 14, 1934.

The property affected by his will consisted of a cattle ranch of some four hundred acres upon which was situated a mining claim, money in the bank and, about eighty head of cattle. This property had been inherited from his father in 1929, but by his own efforts he had considerably increased its value during the years of his possession.

By his will he gave the ranch and cattle to his only surviving full brother, Charles W. Smethurst, the respondent herein, and the residue to one of his nephews of the full blood, Harold Smethurst. He excluded his half-brother, two half-sisters as well as nephews other than the one provided for.

The will was contested by Raymond Smethurst, a half-brother, and certain nephews, sons of a predeceased full brother, upon the ground of insanity, and also that at the time the will was executed the testator was in a drunken and intoxicated condition, and totally incompetent to realize and appreciate what he was doing, and therefore insane.

Prior to the granting of the motion for judgment notwithstanding the verdict, a motion for a directed verdict had been made at the close of the case and denied. Section 629 of the Code of Civil Procedure provides: "When a motion for a directed verdict, which should have been granted, has been denied and a verdict rendered against the moving party, the court, at any time before the entry of judgment, either on its own motion or on motion of the aggrieved party, shall render judgment in favor of the aggrieved party notwithstanding the verdict. . . . "

Respective counsel differ as to whether the consideration of the trial court and our examination of the evidence in this case, in passing upon the correctness of the granting of the motion for a judgment notwithstanding the verdict, is restricted to the testimony introduced solely upon behalf of the contestants, or whether the entire evidence is subject to review.

Many citations have been submitted and it is apparent from those cases that some uncertainty exists in that regard.

This uncertainty seems to arise out of the fact that sometimes the motion was made at the conclusion of plaintiff's case, and in other cases at the end of all of the testimony in the case. If the motion for a directed verdict is made at the conclusion of plaintiff's case, the court cannot, of course, go beyond the evidence then before the court, but if the motion is made at the close of defendant's case, the court can review the entire record within the limitations imposed by law.

In *Estate of Morey*, 147 Cal. 495 [82 Pac. 57], a proceeding was commenced to revoke the probate of a will. After all the testimony had been offered by the respective parties, contestants moved to submit certain special issues. This motion was opposed by proponents on the ground there was not sufficient evidence to warrant the court, or which would authorize a jury, in finding a verdict on any issue in favor of contestant. The trial court sustained the motion and declined to submit any issue to the jury, and made findings that the will therefore admitted to probate was the last will and testament of David Morey, deceased. Upon appeal it was urged that in refusing to submit the special issues to the jury, the court had in effect, granted a nonsuit which was unauthorized, as the evidence produced on behalf of plaintiff established a case sufficient to have the issue submitted to the jury.

The court said: "The case is before us in substantially the same aspect as if, at the close of the evidence on both sides, the court had directed the jury to bring in a verdict against the contestants. There is, however, no material difference between the rule governing this court in the consideration of the sufficiency of the evidence where the court below has directed a verdict, from that prevailing where a nonsuit is granted on motion made after the evidence for both parties had been given. . . . The above rule, of course, does not mean that in every case where the trial court might properly grant a new trial for insufficiency of evidence for plaintiff it should grant a motion for nonsuit, if made after both parties rest their case, but only that it should do so in very clear cases, which is practically the rule which controls in directing a verdict. Courts are not instituted to enable parties who have neither a wrong to redress nor a right to

enforce to persist in a groundless suit, resting on the chances which arise from prejudice which sometimes influences juries.

In *King* v. *Hercules Powder Co.,* 39 Cal. App. 223 [178 Pac. 531], after all the evidence was in defendants moved for a nonsuit which was granted. In upholding the order, this court held a court was justified in granting defendant's motion for a nonsuit after all the evidence was in, where if the motion had been denied, and a verdict found for plaintiffs, it would have been set aside as not supported by, but contrary to, the evidence. The opinion shows the court examined the entire evidence, weighed the evidence adduced, against a presumption which, standing alone, would have been sufficient to establish a *prima facie* case, and upheld the judgment of the trial court in favor of defendant.

In *Kalish* v. *White,* 36 Cal. App. 604 [173 Pac. 494], a *prima facie* case was made out, but upon the presentation of the evidence for the defense being presented, the circumstances of the imprisonment of plaintiff was explained. The Supreme Court in affirming the action of the trial court said: ''From the evidence it appears that the *prima facie* case made out by the plaintiff was overcome by the evidence justifying Officer Minehan's acts respecting the arrest and imprisonment of plaintiff, and that such evidence in justification was not at all, or at least substantially, rebutted. The action of the trial court in instructing the jury to return a verdict in favor of Minehan, therefore cannot be disturbed. The authorities so hold. 'A directed verdict is proper whenever, *upon the whole evidence,* the judge would be compelled to set a contrary verdict aside as unsupported by the evidence.' '' (*Estate of Baldwin,* 162 Cal. 471 [123 Pac. 267].) To the same effect see *Davis* v. *California St. Cable R. R. Co.,* 105 Cal. 131 [38 Pac. 647].

The *Estate of Campbell,* 46 Cal. App. 612 [189 Pac. 812], recognizes and applies this rule. In *Tinkle* v. *Tait,* 55 Cal. App. 425 [203 Pac. 1031], the court said: ''A trial by jury, under the practice established in this state, does not mean that the party calling for the jury has the right to its verdict irrespective of any control on the part of the trial judge. On the contrary, the jury's determination as to questions of fact, when made, is no more conclusive upon a trial court as against motions for a new trial than are the findings of the trial judge where the case is tried without a jury. It

is not only the right, but it is the duty, of the trial judge to grant a new trial whenever he is of the opinion that the verdict of the jury or his own findings of fact are not sustained by the weight of the evidence. (Sec. 2061, Code Civ. Proc.; *Drathman* v. *Cohen et al.,* 139 Cal. 310 [73 Pac. 181]; *In re Martin,* 113 Cal. 479 [45 Pac. 813]; *Weringer* v. *Rutledge,* 180 Cal. 566 [182 Pac. 31].) And if, upon the conclusion of the taking of the evidence, it appears to a trial judge that a case for the plaintiff has not been made out, it is likewise his duty to give directions for a verdict unless it reasonably appears that, upon another trial, the plaintiff may be able to secure better evidence.''

In the concurring opinion of Mr. Justice Harrison in *White* v. *Warren,* 120 Cal. 322 [49 Pac. 129, 52 Pac. 723], he says: ''It is undoubted law when the determination of an issue depends upon the weight to be given to conflicting evidence, or upon the credibility of witness, or inferences of fact to be drawn from established facts, the court is not authorized to withdraw the question from the jury; but it is equally settled that when the party upon whom the burden of establishing an issue rests has failed to introduce any evidence in support thereof, the court may direct the jury to find against him upon that issue.'' As was said by Mr. Justice Clifford in *Schuylkill & D. Improvement Co.* v. *Munson,* 14 Wall. 442, 448 [20 L. Ed. 867] : ''In every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed''; and in *Pleasants* v. *Fant,* 21 Wall. 116 [22 L. Ed. 780], the rule was stated by Mr. Justice Miller as follows: ''If the court is satisfied that, conceding all the inferences which the jury could justifiably draw from the testimony, the evidence is insufficient to warrant a verdict for the plaintiff, the court may say so to the jury.'' In *Bulger* v. *Rosa,* 119 N. Y. 459, 464 [24 N. E. 853], it was said: ''The test of the right to direct a verdict is whether the court would be bound to set a verdict aside as against evidence, if rendered against the party in whose favor it was directed. If this would be the duty of the court the judge need not await the verdict before acting, but in advance may rule the question as one of law. But, as verdicts

cannot be found on mere conjecture, neither will a shadow or possibility, nor a mere scintilla, stand in the way of ruling the case in favor of the party who shows a substantial right of which there is no substantial contradiction.''

In *Estate of Baldwin*, 162 Cal. 471 [123 Pac. 267], the trial judge, at the conclusion of the testimony, withdrew the cause from the consideration of the jury and directed a verdict for contestants. The Supreme Court there held the doctrine of scintilla of evidence was not accepted in this state and that a directed verdict was proper unless there was substantial evidence tending to prove in favor of plaintiff all the controverted facts necessary to establish his case. "In other words, a directed verdict is proper whenever, upon the whole evidence, the judge would be compelled to set a contrary verdict aside as unsupported by the evidence. To warrant a court in directing a verdict, it is not necessary that there should be an absence of conflict in the evidence, but to deprive the court of the right to exercise this power, if there be a conflict, it must be a substantial one.''

In *Estate of Caspar*, 172 Cal. 147 [155 Pac. 631], Mr. Justice Henshaw states the question to be decided: ''To sum up, then, the situation is this: If contestant did present evidence of so substantial a character as that, notwithstanding the conflict raised by proponent's evidence, it would support a verdict in favor of contestant, it would have been error for the court to have granted a motion for a nonsuit and it was error upon the part of the court to direct a verdict for proponent.''

An analogous situation to the case at bar is found in the *Estate of Finkler*, 3 Cal. (2d) 584, 585 [46 Pac. (2d) 149], where the issue is determined in favor of the proponents. There a contest of a will was filed and upon the trial, at the conclusion of contestant's case, a motion for nonsuit was made upon the ground of insufficiency of the evidence, and denied. At the close of the trial proponents moved for a directed verdict on the same ground, which motion was likewise denied. The jury returned a verdict in favor of contestants, and in due time the proponents moved for judgment notwithstanding the verdict, which was granted. The court there declared, as it had declared in *Estate of Caspar*, *supra*, and others, that the trial court may direct a verdict only when, disregarding conflicting evidence and giving to

contestant's evidence all the value to which it is legally entitled and indulging in every legitimate inference that may be drawn therefrom, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of contestants, if such a verdict were returned. In that case, also, the court in addition to considering the right of the trial court to render a judgment notwithstanding the verdict of a jury, also discussed at considerable length the degree of mental unsoundness necessary to invalidate a will. With that case before us it seems clear that the evidence in this case does not establish such a mental condition on the part of the testator as would justify a verdict of mental unsoundness, whether we confine our examination merely to the evidence offered by the contestants or whether we accept the entire evidence before the jury.

█ We believe, in view of the foregoing authorities, that the trial court was here entitled to weigh and consider all the facts in passing upon the motion for a directed verdict and judgment notwithstanding the evidence, but in doing so must give to contestants' evidence all the value to which it was legally entitled and indulge in every legitimate inference logically to be drawn therefrom; and if after such consideration, the evidence is such that it would have been clearly insufficient to support a verdict in favor of contestants, and a verdict found for contestants thereon, would have been set aside as not supported by, but contrary to, the evidence, the motion must be granted. █ Also there need not be an absence of conflict in the evidence, for to deprive the court of the right to exercise this power, there must be a substantial conflict, and that presupposes at least a comparison of the substance of the conflicting testimony of contestants and proponents.

To establish the grounds of contest, some twenty witnesses were called by the contestants, and the proponents called twelve witnesses to rebut that testimony, so it is obvious it would be impossible in the range of this opinion to attempt to more than summarize the testimony of the various witnesses.

Most of the witnesses testified they had known the testator for many years. Some had lived as his neighbors in Browns Valley, and others had known him in a general way about the community, and had various business dealings with him

at times. It was testified he frequently drank to excess, and several of the witnesses testified they considered him insane. A few considered him insane at all times, but most of them considered him insane only when drinking, and when not under the influence of liquor they declared their opinion to be he was sane. The conception of most of these witnesses as to what constituted insanity was vague and uncertain.

It is also a fact to be noted that several of these witnesses transacted business with the testator even during the times and under the conditions they declared him to be insane; sold him groceries, cashed his checks, discussed the rules governing the use of water as promulgated by the Browns Valley Irrigation District, discussed financial affairs and negotiated for the lease of a mine on the ranch.

This will was executed about two o'clock in the afternoon of Tuesday, May 14, 1934. It is testified to by several persons that from probably ten o'clock to one o'clock and from three-thirty o'clock to about four o'clock they saw the deceased, and that he was intoxicated. No one, other than the subscribing witnesses, saw him at the time the will was executed, and they testified he was not intoxicated, and competent in every way to execute a will.

There is here no claim of undue influence where the question of intoxication is always relevant. ■ The habitual use of intoxicating liquor to excess may result in permanent insanity, but to constitute insanity, more than dipsomania must be shown; it must be a condition of fixed mental unsoundness; nor can insanity be presumed from proof of habitual drunkenness, however excessive or long continued. (*Estate of Mahoney*, 6 Cof. Prob. 1.)

■ The fact that the testator may have been under the influence of intoxicating liquor at the time he made his will does not invalidate the instrument unless he at that time had no independent comprehension of what he was doing (*Estate of Little*, 46 Cal. App. 776 [189 Pac. 818]); and contestants here submitted no evidence in that particular.

■ The intoxication of the testator, assuming it to have been established on the day of execution of the will, must have been of such a degree as to have deprived him of judgment while executing it. It must affirmatively appear that the mind of the testator was totally destroyed, and that

he was so far under the influence of liquor at the instant of its execution that he was incapable of comprehending the nature of his act, the extent of his property and those who had a claim upon his bounty. (*Estate of Mahoney, supra.*)

Among the witnesses for contestant, who testified as to his condition from eight o'clock and up to about one-thirty o'clock of the day the will was executed, was Erma Handy, who said she saw deceased about one o'clock of that day. At that time she met Mervyn, a nephew of deceased, and ahead was walking Mr. Rogers, Don Smethurst, brother of Mervyn, and deceased. The deceased waited on the corner for the witness and her companion to overtake him, and they talked a few minutes, and deceased and his companions then left them and crossed the street to a saloon. At that time the witness described deceased as "very drunk".

Mr. Rogers met deceased about one o'clock of that day, in the company of Mervyn and his brother Don. At that time deceased was staggering drunk, talking loudly and using improper language. He was wandering about, staggering and could scarcely walk. They went to a saloon where deceased had two bottles of beer. He remained about a half-hour and deceased left.

Don Smethurst testified, deceased, in the company of himself and Mervyn left the ranch and drove to Marysville getting there about ten o'clock in the morning of May 14th. Deceased was drunk when they arrived in Marysville. They went to a radio shop about eleven o'clock to have the radio in the car repaired, and shortly after they got to the shop deceased left, but returned about twelve-thirty. At this time he was "very drunk". They walked down the street and met Mr. Rogers, and later Miss Handy joined them. After they left Miss Handy at her place of employment the men went to the Columbia cafe and had a bottle of beer each and then walked back to the radio shop. After remaining there a few minutes deceased left the shop and the witnesses did not see him again until about four o'clock, when he was so intoxicated he had to support himself to keep upright. They returned to the ranch, where deceased went out to the mine, and then they all returned to Marysville. The two younger men went to a show and when they wanted to go home could not find deceased, but about midnight they found he had registered in a hotel and had gone to bed. Upon their arrival in Marysville

in the morning, testator met Mr. Gregory and they talked together for some time out of the hearing of the witness.

Mervyn Smethurst, a nephew, testifying concerning the 14th of May, said they got up about eight o'clock in the morning and decided to go to Marysville to have the radio repaired. Deceased drank about one-half of a pint of grape brandy. They arrived about nine-thirty, drove to the Columbia cafe and there met Mr. Gregory where they had a couple of bottles of beer. There Gregory and deceased talked about a mining deal. They then went to the radio shop. Deceased said he had some business down town and said he would be be back later; he left and returned about twelve-thirty. At that time he was very drunk. They then walked down the street and met Mr. Rogers, and later Miss Handy. They had a couple of bottles of beer and separated, the boys going back to the radio shop and deceased going down town, agreeing to meet them later at the Columbia. They went to the Columbia about three o'clock, but deceased was not there; they returned later and he was at the Columbia waiting for them. He was very intoxicated. They returned to the radio shop, where deceased paid the bill for the repair work, and they returned to the ranch.

Rollie Anderson, the radio mechanic, saw deceased at the shop on the morning of May 14th, but did not observe him much except that he was staggering drunk. He met and shook hands with a couple of friends passing the shop.

Nick Pashalar, a restaurant man who operated the Columbia, said he was drunk at three-thirty in the afternoon when he got off shift. L. K. Gregory, a mining promoter, who had negotiated the lease on the mine on deceased's property, testified on May 14th, deceased was insane and very drunk. He stated it did not require much liquor to make deceased intoxicated. Witness often talked to deceased while he was drinking and he apparently then understood what was said, but the next day he could not recall what had been discussed. He sometimes talked of his troubles and would break down and cry. He suspected his nephew was conspiring with the superintendent of the mine to defraud him. He thought someone was trying to kill him. On May 14th, the witness saw deceased arrive in Marysville. He was then intoxicated. They were together about forty minutes and discussed with him at that time the matter of granting a thirty-day extension

to make a payment on the mine. At about four or five o'clock the witness saw deceased again and he was a little more intoxicated than he had been in the morning.

The witness later modified his statement as to the insanity of deceased and said he did not think he was insane all of the time; but when he was drinking he thought he was. He received many checks from deceased, and had had many business transactions with testator during the last ten months of testator's life.

The foregoing constitutes a summary of all of the evidence produced by the contestants as to the condition of the deceased on the day the will was executed.

In relation to the execution of the will, Mr. Belcher, one of the subscribing witnesses, testified that he had known the testator for many years, and on several occasions the deceased had discussed the drawing of a will with him and the disposition of his property. On May 14, 1934, testator came into his office and directed him to prepare a will and told him how he wanted to distribute his estate. It was then after nine o'clock in the morning. He was told to return in the afternoon, which he did, and the document not being ready, he waited until it was written. When it was prepared it was read to him, and he expressed his assent to its terms and he then signed it. The witness testified he saw no indication that the deceased had been drinking in the morning, and when he returned in the afternoon about two o'clock he saw no indications of drunkenness. This testimony was corroborated by the stenographer who was in the office during all of that time, and also acted as one of the subscribing witnesses.

The *Estate of Bemmerly*, 110 Cal. App. 550 [294 Pac. 33], defines testamentary capacity as follows: ''The law is well settled in this state that a 'testator is of sound and disposing mind and memory, if, at the time of making his will he has sufficient mental capacity to be able to understand the nature of the act he was doing, and to understand and recall the nature and situation of his property, and to remember and understand his relation to the persons who have claims upon his bounty, and whose interests are affected by the provisions of the instrument'.''

The presumption is that a person is sane and therefore it devolved upon the contestants to establish not only that the testator was of unsound mind, but that at the very

time testator executed his will he did not have the mental capacity to know the nature of his act, or the nature or situation of his property, the natural objects of his bounty and how they would be affected by the will.

Upon the contest of a will on the ground that the deceased was of unsound mind it is the mental condition of the testator at the very time of the execution of the will that is important. Evidence as to mental condition before or after the execution of the will is important only in so far as it tends to show the mental condition at the time of the execution of the instrument.

Therefore there being no direct evidence of incompetency at the very time of the testamentary act, it is necessary to determine whether or not the inferences to be drawn from the evidence of mental condition before and after the testamentary act are in substantial conflict with the presumption of competency and with the positive testimony of the subscribing witnesses, and other uncontradicted proof of sound mental condition at the very time in question.

It appears from the testimony of contestants that when sober, the testator lived a normal life, and when drunk, transacted various items of business, some important and others less so, but all indicative of the possession of a sufficient intelligence to comply with the requirements of the law in the execution of a will.

The characterization of the acts of the deceased by witnesses as that of an insane person or the declaration that he was so drunk he did not realize what he was doing are of no greater value than the reasons given in support of the opinion. It is not the mere opinion of the witness that carries weight but the reasons in support thereof to what the court and jury attach importance. (*Estate of Flint,* 179 Cal. 552 [177 Pac. 451]; *Estate of Redfield,* 116 Cal. 637 [48 Pac. 794].)

In the instant case the most favorable inference that can be drawn from the contestants' showing of the testator's mental condition and his habits and behavior while drinking and his intoxicated condition on the date of the will both before and after the testamentary act, is only that he *might* have been lacking testamentary capacity when he executed that instrument. The real question, however, for the jury is not what *might* have been the mental condition of the testator at

336

the time of the execution of his will, but what *actually* was that condition. (*In re Wilson*, 117 Cal. 262, 263 [49 Pac. 172, 711].)

In *Estate of Casarotti*, 184 Cal. 73 [192 Pac. 1085], it was established that an hour or so before and an hour or so after the execution of the will, testator was in a stupor. The court held that there was no conflict between such showing and the testimony of the attorney who was present at the actual moment of the execution of the will, to the effect that the testator had been sufficiently aroused from his stupor to be competent.

We believe the trial court was not only justified, but compelled under the facts, to set aside the finding of the jury, and the judgment and order entered by the court should therefore be affirmed, and it is so ordered.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 8, 1936, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 4, 1936.