[Civ. No. 13682. Second Dist., Div. Three. June 18, 1943.]

Estate of ABNER H. STONE, Deceased. FANNIE BOMASH, Appellant, v. JEROME STONE et al., Respondents.

264

Dudley Robinson for Appellant.

Jerry Giesler and Ward Sullivan for Respondents.

SHINN, Acting P. J.—Fannie Bomash, sister of Abner H. Stone, deceased, appeals from a judgment dismissing her will contest and admitting the will of said decedent to probate after a jury had rendered a special verdict that the will had not been executed by decedent before subscribing witnesses in the manner prescribed by law. Other grounds of contest were eliminated by nonsuit. The sole question on the appeal is whether there was evidence which, viewed in the light most favorable to contestant, gave substantial support to the finding of the jury against due execution.

Upon a review of the evidence we have become satisfied that the verdict was without substantial support, and that the circumstances to be hereinafter related and which are all the evidence, direct or indirect, tending to support the verdict, went no further than to justify a suspicion that the subscribing witnesses were not present when the testator signed the will and that they signed it after his death. The will admittedly was signed by the testator and the witnesses; the question as to execution was whether the witnesses had signed in the presence of the testator or after his death.

Jerome Stone, chief beneficiary and one of the executors of the will, was a nephew of decedent and his assistant in the latter's business of dealing in trust deeds. The two, being unmarried, lived together in an apartment and Abner often referred to Jerome as his brother. The will bears the signatures of two persons as witnesses, Celia LeVee, mother of Jerome, and Joseph Loeb, who after the date of the will and before the trial of the contest married one of two sisters, Jerome having married the other. The testimony as to the execution of the will was that Jerome, at Abner's request, called Celia LeVee and Joseph Loeb to come to the apartment of Abner and Jerome on Sunday morning, February 5, 1939. Before their arrival Abner was engaged in writing the will by typewriter, making one carbon impression. He signed the will in the presence of the three persons and asked Celia LeVee and Joseph Loeb to "sign the will which he had just written and signed." A line was drawn by typewriter for the testator's signature, but no lines for those of the witnesses. Loeb wrote the words "Witnessed by" on one of the copies and signed his name, below which Celia signed. Abner signed the other copy also but the witnesses did not. Abner folded both copies and put them in his pocket, from which he then took one, placed it in an envelope (which we shall call No. 1), sealed it, and gave it to Jerome to put in a dresser drawer, which was done. A day or so later Abner gave Jerome another envelope (No. 2), which Jerome placed in a drawer of the dresser under instructions from Abner to open it in case anything went "haywire" as a result of an operation which Abner was about to undergo. Envelope No. 2 contained instructions to Jerome for Abner's burial, which were dated February 6, one day after the date of the will. Abner later went to the hospital, submitted to the operation and died April 18. Other events described by the witnesses were

the following: while in the hospital Abner directed Jerome to get Envelope No. 1, which Abner referred to as being marked "Instructions to Jerome Stone," to put it in Jerome's safe deposit box and not to open it until he was told to do so by Widoff, an attorney who was named as the other executor. Envelope No. 2 was opened by Jerome on the evening of Abner's death and was found to contain burial instructions. Envelope No. 1, containing the witnessed will, was taken from Jerome's box some days after Abner's death and under circumstances to be hereafter related. This envelope also contained a copy of the burial instructions. Eight days after Abner's death seven of the relatives of decedent, and Widoff, the attorney who had arranged for the opening of the box, gathered at the Farmers & Merchants Bank, where they met an employee of the bank and a deputy county treasurer, and Abner's safe deposit box was opened. The unwitnessed will, which was the original typewritten impression, was taken out and read. Comment was made by the deputy county treasurer that the document was unwitnessed, and he asked whether it should be read, to which Widoff replied that he thought the folks would like to hear it read anyway for what it was worth and he proceeded to read it. After the document was photostated by the bank, Widoff and Jerome went to another room in the bank and received the will from a bank officer, signing a receipt therefor which recited that it was unwitnessed. The officer of the bank testified that when he took the receipt he remarked that the will was unwitnessed and stated that he wondered whether it would be acceptable that way and that either Widoff or Stone said that he didn't think there would be any reason why it wouldn't be accepted. Widoff and Jerome left the bank together and as they walked away they discussed the unwitnessed will and Widoff told Jerome that it was not worth the paper it was written on, whereupon Jerome said that he had seen a witnessed will and that Abner had given him a sealed envelope with instructions not to open it until Widoff told him to and that he had this envelope in his safe deposit box; Widoff told him to get it immediately and bring it to Widoff's office. The Farmers & Merchants Bank was at Fourth and Main Streets, Jerome's box at Eighth and Broadway. Jerome walked the intervening six blocks, got the envelope out of his box, took it to Widoff's office, where it was opened in the presence of Widoff and one Sidney Stone, who was not a witness in the case. Jerome

and Widoff testified that the witnessed will was found in the envelope; it was taken by Jerome, under Widoff's instructions, to the first mentioned bank, where it was photostated. The same afternoon it was filed for probate upon petition of Jerome and Widoff. Jerome and Widoff had left the Farmers & Merchants Bank shortly after noon. Approximately an hour and a half elapsed before Jerome returned to the bank with the witnessed will. In Widoff's office the men had discussed the assets of the estate and the matter of the probate of the will.

The theory of the contestant at the trial, and the one insisted upon here, is that the signatures of the witnesses were subscribed to the will during the hour and a half that intervened while Jerome was going to his safe deposit box and returning to the Farmers & Merchants Bank with the will which bore the signatures. The circumstances upon which appellant relies to support the verdict are the following: that the unwitnessed copy and not the witnessed will was found in Abner's safe deposit box; that Jerome remained silent when the deputy county treasurer remarked that the will was not witnessed; that Jerome made a number of visits to Abner's safe deposit box while the latter was in the hospital and yet testified that he had not seen the unwitnessed document in the box with Abner's other papers; that Jerome testified that Abner put one copy of the will in an envelope and gave it to him and yet later testified that he did not know until he opened the envelope that it contained the will; that he testified that Abner sealed the envelope before giving it to him and yet the envelope containing the will was found to contain a copy of the burial instructions, which were dated one day later than the will. Much importance is attached to the fact that Jerome had an opportunity and a motive to produce a witnessed will. The fact that Jerome at the direction of Widoff had the witnessed will photostated by the bank is pointed out as a suspicious circumstance indicating a purpose to manufacture evidence. It is also claimed to be a significant fact that the names of the witnesses were not signed with the pen used by Abner. The circumstances that the witnesses were persons who were close to Jerome and that they were called in to witness the will from different parts of the city are said to be extraordinary. In connection with the foregoing facts, minor discrepancies and inconsis-

tencies in the testimony of Jerome and the subscribing witnesses are alluded to.

■ It will be sufficient to preface our discussion of the evidence with the observation that the law does not accept speculation, supposition, or conjecture as proof. In analyzing the evidence we must first of all separate that which tends to give affirmative support to plaintiff's contention that the will was not executed from the evidence which tends to prove that it was duly executed. We must not confuse the will contest with the proceeding for the probate of the will, for they are separate proceedings. The nature of a proceeding for the contest of a will before probate and the rules of procedure applying thereto have been explained so fully by decisions of the Supreme Court as to firmly establish certain rules, which may be stated briefly. Contestant was plaintiff in the will contest; proponents were in a purely defensive position. ■ The trial judge was concerned with the strength or weakness of contestant's case, not with that of proponents. The latter were not called upon to offer any proof at all unless and until contestant had offered proof which, standing alone, would have warranted a finding that the will had not been duly executed. In the absence of such evidence it was the duty of the court to dismiss the contest and to proceed separately to consider the petition for probate. (*Estate of Latour*, (1903) 140 Cal. 414, 420 [73 P. 1070, 74 P. 441]; *Estate of Relph*, (1923) 192 Cal. 451, 458 [221 P. 361].) It follows then that contestant could not prevail through the weakness of proponents' case and merely because the testimony of proponents and their witnesses may have been subject to suspicion or otherwise unsatisfactory; she could succeed only by producing affirmative proof to sustain her allegation of nonexecution. ■ The will itself, bearing the signatures of the testator and two subscribing witnesses, even without the usual attesting clause, which was not present, gave rise to a presumption that the will had been duly executed, and this presumption was evidence in the case. (*Estate of Braue*, (1941) 45 Cal.App.2d 502 [114 P.2d 386]; *Estate of Pitcairn*, (1936) 6 Cal.2d 730 [59 P.2d 90].)

It is unnecessary to discuss the arguments of appellant which call attention to alleged contradictions and inconsistencies in the testimony of the witnesses Jerome Stone, Celia LeVee, Joseph Loeb, and certain other witnesses whose testi-

mony gave support to that of the witnesses named. If there was anything in the testimony of these witnesses tending in any way to give affirmative support to contestant's claim that the will was not properly executed, it would of course be entitled to the most careful consideration, but there was no such testimony.

■ Attention may be directed next to certain facts in evidence which are relied upon by appellant but which in our opinion are without probative value to establish nonexecution of the will. The fact that it would have been possible for the witnesses to subscribe their names to the will during the hour and a half interval we have mentioned has, of course, not even slight value as evidence that they did so. There was no evidence whatever that they did witness the will after the death of Abner, and the fact that they had an opportunity to do so proves nothing. Two disinterested witnesses testified that the subscribing witness Loeb was in their butcher shop, and a third witness testified that Mrs. LeVee was in his dental office during the time when they would have had to be with Jerome Stone in order to fabricate the will. Appellant's argument, which is directed to the matter of the weight of the testimony of these witnesses, is beside the point which we are to examine, for if their testimony, which was introduced by proponents, should be disregarded entirely we would have left only the possibility that Loeb and Mrs. LeVee could have been with Jerome Stone, which would furnish no support for the contention that they were with him. And, as we have said, we are not concerned with the alleged weakness of proponents' case.

■ If there is any fact in the case tending in the slightest degree to warrant an inference of other facts tending to support the allegation of nonexecution, it is that Jerome said nothing to the other relatives at the meeting in the bank about having seen a witnessed will or having in his possession a sealed envelope which he had received from Abner. When weighed as proof, Jerome's silence will be seen to be wholly without evidentiary value. Plaintiff's argument proceeds somewhat as follows: Jerome overheard the remark of the deputy county treasurer to the effect that the will was not witnessed. He then believed the will to be valid. (This assumption, as we shall see, breaks the chain of appel-

lant's reasoning.) Jerome knew that the other copy of Abner's will was in a sealed envelope and reposing in his safe deposit box. Wherefore, it is argued, if Jerome had had a witnessed will he would have said so, and because he did not say so, he did not have it and therefore the will had not been witnessed during Abner's lifetime but had been subscribed by the witnesses during the hour and a half immediately following the departure of Jerome and Widoff from the Farmers & Merchants Bank. We shall notice first appellant's assumption that Jerome heard the remark of the deputy county treasurer. We refer to it as an assumption and not as an established fact because Jerome did or said nothing to indicate that he had overheard the remark, he testified that he did not recall having heard it, and it would appear from his testimony and from that of the bank officer who was present, who also testified that he did not recall such a remark, that it might have been addressed to Widoff, who replied to it, and then read the will. Appellant's first inference, then, is that because the remark was made, Jerome heard it. The next inference is that Jerome believed the will to be valid until Widoff told him after they had left the bank that it was invalid. Neither Jerome nor anyone else stated the belief that it was valid during the family gathering and there was nothing to indicate what was in Jerome's mind. But this assumption as to Jerome's belief does not aid appellant. It seems to us that if Jerome did believe the unwitnessed will to be valid he was not called upon to say that he had seen or had another one. Appellant's next assumption is that Jerome knew that he had another copy of the will in his safe deposit box and if he had known that to be a witnessed copy he would have told of it after hearing the comment upon the unwitnessed will. His silence in the meeting at the bank was meaningless unless it be assumed as a fact that he either knew he had a witnessed will in his safe deposit box or was sufficiently sure of it to have felt warranted in stating it to be the fact. The evidence did not establish the fact that Jerome knew he had a copy of the will in his safe deposit box, and the fact of his knowledge would have to be inferred from the circumstances. He undoubtedly believed that Envelope No. 1, when he received it from Abner after it had been sealed, did contain a copy of the will, but it must be remembered that he put that envelope in the dresser drawer

and that when he opended it in Widoff's office the envelope contained not only the will but also a copy of the burial instructions dated one day after the date of the will and the envelope had been inscribed by Abner "Jerome Stone Instructions." When, at Abner's request, given while he was in the hospital, Jerome took an envelope from the drawer and placed it in his safe deposit box, it was evidently one which Abner had substituted for Envelope No. 1 in order to place with the will a copy of the burial instructions. There was no evidence that Jerome knew what was in that envelope until it was opened in Widoff's office within an hour after the family gathering at the Farmers & Merchants Bank. Obviously if Jerome did not know or was in doubt as to what was in the envelope, his silence as to having it in his possession was without significance. He did not tell the relatives that he had the sealed envelope and yet no one questions that he had it. There was no evidence that he had ever read the burial instructions and we can conceive of no reason why he should have discussed with the relatives the fact that there were instructions until he had read them. His failure to mention them was quite natural. And again, we do not see how it can be put aside as unnatural or unreasonable that Jerome may not have wished to discuss the will with the other relatives, especially in the presence of an officer of the bank and a deputy county treasurer. When we have followed appellant through the devious inferences with which she supports her argument, we are confronted by the final fact that Jerome, if he heard the discussion about the will, if he had an opinion as to whether it was valid or invalid, if he knew he had another copy of Abner's will in his own safe deposit box, could reasonably have considered it to be the part of discretion not to discuss it with the assembled relatives. He was the principal beneficiary under the will. Is it unreasonable to suppose, in view of the contest that later developed, that Jerome considered it the part of discretion to invite no controversy with other members of the family? We know of no established rule or standard of conduct pertaining to such situations under which Jerome's silence upon any assumed state of facts would be unnatural, unreasonable or even suspicious. His indubitably was a discreet silence, as proved by subsequent developments. We

cannot characterize his silence under the circumstances, even assuming all of appellant's assumptions and inferences to be warranted, as going further than to raise a faint suspicion that he may not then have had in his possession a duly witnessed will. Whether even that suspicion would be warranted we do not say; suspicion is not a recognized element of proof.

We find no evidence other than that which we have discussed which tends even remotely to support the allegations of contestant that the will was not duly executed. What we have said amply sustains the action of the trial judge in giving judgment against contestant notwithstanding the special verdict in her favor. However, it may not be amiss to go a bit further in justifying that ruling. The trial judge in passing upon the motion for judgment notwithstanding the verdict was entitled to take into consideration all of the evidence at the trial. (*Estate of Smethurst,* (1936) 15 Cal. App.2d 322, 330 [59 P.2d 830].) Some of the established facts were that Jerome Stone had access to Abner's safe deposit box and undoubtedly enjoyed the affection and confidence of his uncle, that the will expressed the latter's desires with respect to the disposition of his estate, in which Jerome was preferred, that the making of the will was Abner's voluntary act, that his entrusting it to Jerome was not unnatural in view of the fact that the latter was chief beneficiary and one of the executors and had been directed to arrange for Abner's burial, and the further facts that the manner in which the will was alleged to have been executed was a reasonable and natural one and that the testimony regarding its execution was not inconsistent with other proven facts. All of these facts were pertinent to the question the trial judge had to decide, namely, whether Jerome's conduct and the surrounding circumstances warranted a legal inference that proponents and their witnesses were guilty of gross fraud and perjury and the offering of a false document in evidence. We are unable to point to any direct evidence or any inference from facts in evidence which we could characterize as even slight proof that on February 5, 1939, Abner Stone did not execute his will before witnesses. The court did not err in admitting the will to probate notwithstanding the finding of the jury that it had not been executed with

due legal formalities. Had the ruling been otherwise it could not have been sustained on appeal.

The judgment and order are affirmed.

Wood (Parker), J., concurred.

BISHOP, J. pro tem.—I dissent. I take my stand with the jury in this case, even though it means that, measured by the majority opinion, mine is not a reasonable mind; that I am not any more able than were the jurors to distinguish between fact and fancy.

The legal principles that govern are neither complicated nor in dispute. The order for the entry of a judgment notwithstanding the verdict should not have been granted unless there was "no evidence of sufficient substantiality to support a verdict in favor of the plaintiff" (*Estate of Leahy,* (1936) 5 Cal.2d 301, 303 [54 P.2d 704, 705], repeating a portion of a quotation in *Estate of Lances,* (1932) 216 Cal. 397, 400 [14 P.2d 768], respecting the like rule as to a directed verdict). I differ from my learned associates in that I find in the evidence substantial support for the jury's negative answer to this question, which was given them: "Was the alleged will, Exhibit A, on February 5th, 1939, declared by Abner H. Stone to be his will to Joseph Loeb and Celia LeVee and thereupon subscribed by him and upon his request these witnesses each signed as a witness in his presence and in the presence of each other?"

The evidence to support the jury's answer need not be direct; circumstantial evidence suffices, if it meets the test of "reasonable minds." A single thread may be weak, but a number of threads twisted together may support a heavy burden. So it may be with circumstances. "Whether a particular inference can be drawn from certain evidence is a question of law, but whether the inference shall be drawn, in any given case, is a question of fact for the jury." (*Blank* v. *Coffin,* (1942) 20 Cal.2d 457, 461 [126 P.2d 868, 870].)

Jurors are not compelled to accept or reject all of a witness' testimony; they may accept those portions which appeal to them while rejecting those that they do not believe. (*People* v. *Smith,* (1940) 15 Cal.2d 640, 648 [104 P.2d 510].) The jurors in this case may very well have believed that Abner Stone did, on the date which was an element of the

question put to them, typewrite an original and a carbon of that which he thought would become his will. He was accustomed, evidence revealed, to draw his own legal papers, and Exhibits A and B, the original and carbon copies of his "will," were each drawn on a letterhead of the Cosmopolitan Hotel of Denver, and bear internal evidence of draftsmanship by a layman. He typewrote a line upon which to place his signature, but made no provision for the signature of witnesses. This, of itself, is not of great significance, but it is one of the circumstances which the jury doubtless weighed with other facts.

The copy that was found in Abner's safe deposit box was placed there by Abner, the jury could have determined. Of this there was no direct evidence, but it did not get there by itself and Jerome testified that he did not know of its presence there, so Abner must have placed it there on February 7, the last time he opened his box. Had the carbon copy, through some slip, been witnessed, when the original copy was not, persons not learned in law but versed in the usual propensities of men would expect Abner to seek sanctuary for the carbon copy, not for the unwitnessed original. But it was the original copy, not the "witnessed" carbon copy that he placed in safety. Nor would it seem natural that Abner, had he a witnessed copy of his will, would insert it in an envelope, marked "Instructions to Jerome Stone," give it to Jerome without revealing its contents but with directions not to open it until someone, who did not know of its existence, told him to.

The jury had Jerome before them on the witness stand. They knew he had been present when Abner prepared the original and carbon copy, Exhibits A and B. If it were true that witnesses had been called in and went through the ceremony of witnessing Abner's will, Jerome knew it. Jerome knew that after the will was witnessed, if it was witnessed, that Abner put both copies in his pocket, then took one out, sealed it in an envelope and had it placed in the drawer of their common bureau. Was it the witnessed will that was in the drawer, or was that still in Abner's pocket? Jerome must have wondered about this, if one will was witnessed and one was not, but did not know the answer until the next big scene, the opening of the box.

Jerome was present in the group when the original copy

was taken out of the box, he remembered that, and he remembered that it was read aloud, but he did not remember, so he testified, that anyone said anything about it having no witnesses. In view of testimony that the three events did take place, that is, the taking of the unwitnessed original copy out of the box, the making of the comment that "Here is a document that seems to be a will but has not witnesses on it. Do you think it ought to be read?" and the reading of the will, and that they followed each other in immediate succession, the jurors were certainly acting within the realm of reason when they concluded it to be a fact that Jerome did hear the comment. Then, after it was read, the one sheet of paper was passed around, from one to another, of those present, and Jerome could see that it was not the will that had been witnessed by his mother and future brother-in-law on February 5.

Is it to be held so surely true, that it can be declared as a matter of law, that the jury could not interpret Jerome's silence, at this moment, as eloquent as a statement on his part that he knew nothing of any will of Abner's having been witnessed? Was the jury unreasoning in concluding that one who had passed through the experience of The Witnessing of the Will, and who had wondered what had become of it, and who attends the ceremony of Opening the Deposit Box, only to find a will without witnesses, resulting in a query as to whether it ought to be read, would naturally, involuntarily, declare, in the family circle gathered there: "This isn't the only will, there is one mama witnessed." Jerome's failure to do the thing that your neighbors would expect him to do, if he knew of a will that had been witnessed, warranted the jury in concluding that he knew of no witnessed will, and consequently that the ceremony of February 5 had not taken place. The right of the jurors, charged with the duty of determining the facts at issue before them, to so conclude, is not to be destroyed by pointing out other reasons to which they might have ascribed Jerome's silence. The statement in the case of *Estate of Wallace,* (1923) 64 Cal.App. 107, 110 [220 P. 682], that "An inference cannot be said to be established by circumstantial evidence, either in a civil or criminal case, unless the circumstances relied upon are of such a nature and so related to each other that it is the only inference which can be fairly or reasonably drawn from

them. If other inferences may reasonably be drawn from the facts in evidence, the evidence does not support the inference sought to be deduced,'' quoted by respondent, was disapproved by the Supreme Court as it denied a hearing of the case, a fact pointed out in *Robertson* v. *Weingart*, (1928) 91 Cal.App. 715, 723 [267 P. 741], in *Strock* v. *Pickwick Stages System*, (1930) 107 Cal.App. 298, 301 [290 P. 482], and in *Lejeune* v. *General Petroleum Corp.*, (1932)˙ 128 Cal. App. 404, 416 [18 P.2d 429]. The correct rule is that stated in *Medico-Dental etc. Co.* v. *Horton & Converse*, (1942) 21 Cal.2d 411, 436 [132 P.2d 457, 471] : ''Where different inferences might fairly and reasonably be deduced from the evidence, the choice made by the trial court, in the absence of an abuse of discretion, is binding on the appeal.'' See, also, *Mitchell Camera Corp.* v. *Fox Film Corp.*, (1937) 8 Cal.2d 192, 197 [64 P.2d 946].

The evidence of the events during the noon hour, following Jerome's disclosure to Widoff that he had an envelope not to be opened until Widoff told him to, fails to prove that the will was witnessed during that period but its failure in this regard does not rob it of its value. The contestant had the heavy burden of proving a negative, that the will was not witnessed on February 5. It was an aid to the contestant in discharging her burden not only to prove facts from which it could be inferred that the will had not been witnessed February 5, but also to prove that it might have been witnessed at a later day. The possibility that it was witnessed that later day is not proof that it was, but it was an aid to the jury in coming to their conclusion, because it proved that the earlier date was not the only possible one.

The trial court should not have substituted his view of the facts for that of the jury; the judgment notwithstanding the verdict should not have been rendered.

A petition for a rehearing was denied July 14, 1943. Bishop, J. pro tem., voted for a rehearing. Appellant's petition for a hearing by the Supreme Court was denied August 16, 1943. Curtis, J., and Traynor, J., voted for a hearing.