[Civ. No. 3967. Second Appellate District, Division One.—December 11, 1922.]

## MARION H. KOHN, Appellant, v. NATIONAL FILM CORPORATION OF AMERICA (a Virginia Corporation), Respondent.

[1] TRIALS—EVIDENCE—WHEN DIRECTED VERDICT AUTHORIZED.—A direction by the trial judge that a verdict be returned for the plaintiff or defendant is not authorized where there is a conflict in the evidence of a substantial kind; but a bare conflict, created by what is sometimes termed a "scintilla" of evidence, is not substantial. The rule is precisely the same as that applied where a motion for judgment of nonsuit is under consideration. On such a motion it must appear that the evidence utterly fails as to essentials necessary to be proved before an order granting the same will be allowed to stand.

[2] ID.—DIRECTED VERDICT—MOTION—PARTIES.—The motion for a directed verdict may be made either by the plaintiff where, upon the whole evidence, the cause of action alleged in the complaint is supported and no support is given to the defense alleged by defendant, or it may be made by the defendant whenever a complete defense has been made out by uncontradicted evidence; and such a motion may properly be made by the defendant even though he has the burden of proof.

[3] ID.—BREACH OF CONTRACT—ACTION FOR DAMAGES—EVIDENCE—DIRECTED VERDICT.—In this action to recover damages for the alleged breach of a contract under which defendant was to manufacture certain motion pictures for plaintiff, undisputed evidence having shown that after certain differences had arisen between plaintiff and defendant they had agreed upon a settlement of their differences and put an end to further prosecution of any work under the contract, defendant having accepted certain negatives in lieu of money due from plaintiff on account of production costs, and plaintiff having accepted certain other negatives which he had theretofore refused to accept, and it having been agreed that the entire transaction was adjusted and closed, the trial court properly directed the jury to return a verdict for defendant.

APPEAL from a judgment of the Superior Court of Los Angeles County. J. P. Wood, Judge. Affirmed.

The facts are stated in the opinion of the court.

J. D. Lederman and Loeb, Walker & Loeb for Appellant.

Janeway, Beach & Pratt and Frank M. Gunter for Respondent.

JAMES, J.—Plaintiff commenced this action to recover a large amount of damages—a sum in excess of $100,000—which he alleged he had suffered by reason of breach of contract committed by the defendant. The contract was set out in full in the complaint. The defendant's answer denied the material allegations as to plaintiff having been damaged and especially alleged that the entire controversy had, on a date prior to the commencement of the action, been settled by agreement between the parties. At the conclusion of all the evidence the trial judge directed the jury to bring in a verdict in favor of the defendant, which verdict was returned and judgment entered accordingly. From that judgment plaintiff has appealed.

The defendant corporation was engaged in the business of manufacturing films for exhibition purposes. The plaintiff dealt in films as a producer. The contract between defendant and the plaintiff was made on the 12th of January, 1920, and required the defendant to manufacture twenty-six one-reel comedies featuring "Smiling Bill Jones" and twenty-

six one-reel comedies featuring ''Polly Moran.'' The contract provided that the films should be ''first-class, salable, standard comedies'' and that each comedy should be ''a finished product.'' The latter requirement was further defined as follows: ''It is understood and agreed that the term 'finished product' means a positive film properly cut, titled and assembled and the negative cut in accordance therewith.'' The defendant, as the contract terms stated, was required to ''deliver one negative and one positive print of each picture, together with a continuity sheet of same, a synopsis, two dozen still photographs and one dozen plates for each production made under this contract.'' The first delivery was to be made on the first day of March, 1920, and succeeding deliveries each week thereafter, the Jones pictures and Moran pictures to be delivered in alternate weeks. On his part plaintiff agreed to pay not to exceed $2,250 for each comedy. It was further provided that a statement of the actual cost of each picture was to be furnished to the plaintiff, and that the plaintiff should sell the pictures and, after deducting publicity and sale expenses, should return to the defendant forty per cent of the remaining profits. This contract was modified early in March so as to provide that, as to the Moran pictures, there should be manufactured twenty-six two-reel instead of twenty-six one-reel comedies. Under the modification plaintiff was required to advance the sum of $6,000 toward the production of each of the two-reel comedies. By May, 1920, several comedy films had been manufactured under the contract and various payments on account of advanced cost had been made by the plaintiff to the defendant. Plaintiff had received several positive prints of these films and had endeavored to dispose of them on the market. His evidence, as furnished by himself and several witnesses engaged in the trade, was that the films were faulty in several particulars, which were enumerated, and that they were not salable. Prior to the meeting of June 12th, which is referred to hereinafter, he had notified the defendant that the films were not salable and that he would not accept them, and that defendant should not proceed to manufacture any more. At that time he was in arrears on advanced production cost required to be paid under the terms of the contract in an amount of about $9,000. Defendant was demanding that he pay this money. Plaintiff

advised the defendant that he was having trouble securing money because of the poor quality of the films. As a result of the insistent demand made by the defendant that he pay to it the money claimed, a meeting was arranged, which meeting was held on June 12, 1920, at the office of the defendant in Hollywood. The meeting was attended by plaintiff and an associate named Chatkin, and on the part of the defendant by some of its officers. The discussion lasted for several hours and, as the witnesses seemed to agree, it took the form of a heated controversy during a great deal of that time. The outcome of it all was that the defendant agreed to accept in settlement of the expense ·account, which upon being then checked up was found to be somewhat in excess of $9,000, the negative films of three pictures, which it had previously, under a different contract, manufactured for plaintiff, and sell those pictures, returning to plaintiff any excess received over the amount of the indebtedness. Plaintiff accepted the seven Jones negatives and three of the Morans, and gave his receipt therefor, which receipt expressed no reservation. The receipt of these negatives occurred several days after the meeting of June 12th, and immediately after the three negatives last before referred to were delivered to defendant. Up to this point there is absolutely no controversy between the parties as to the facts. The main question argued by appellant is that it was not shown clear of conflict in the evidence that, through the arrangement made at the meeting of June 12th and the receipt of the Jones and Moran negatives by plaintiff several days later, a final adjustment was made of all accounts, including any claims for damages which plaintiff might have had as attributable to the defective quality of the films which were manufactured. It should be remembered that there is no controversy but that plaintiff had previously notified the defendant that he would not accept the pictures, the negatives of which were later receipted for by him as stated, nor is there any controversy but that further production of pictures under the contract was mutually abandoned at that time. And notwithstanding this latter indisputable fact, the plaintiff here included in his complaint not only claim for damages arising because of the defects in the films manufactured, but also for profits which he might have made upon the full number agreed to be produced. Before pro-

ceeding, as we will next do, to analyze briefly the evidence as to what occurred at the meeting of June 12th, it may be well to recapitulate the condition of the controversy as it stood without suggestion of any dispute: Defendant had manufactured a portion of the films agreed to be furnished under its contract and had possession of the most material part of the merchandise, to wit, the negatives; plaintiff, after having viewed, examined and attempted to market copies or prints from those negatives, notified the defendant that he would refuse to accept the films, and that the defendant should not proceed further in the execution of its contract. The defendant demanded that it be paid money which the plaintiff had agreed to pay on account of production costs, and the plaintiff insisted that the quality of the films was not such as the contract required the defendant to manufacture, and, still insisting upon his refusal to accept the same, entered into a conference with the defendant. In addition to the circumstances shown, the defendant at the trial produced witnesses who were present at that conference who gave testimony amply supporting the defense that, as a result of that meeting, it was expressly agreed that defendant, in lieu of money, would accept from the plaintiff three negatives of a "Cunard" picture, and that the plaintiff took from the hands of the defendant the three Moran and seven Jones negatives (which he had theretofore declined to accept) and that the entire transaction was thus agreed to be adjusted and closed. That such was the condition brought about through the arrangement made at that time the trial judge held was shown without material dispute in the evidence.

[1]    The situation of a case which will authorize a trial judge to direct that a verdict be returned for the plaintiff or defendant has been defined many times in decisions of the supreme court of this and other states, for the rule is practically the same throughout the country. Briefly stated, such a direction is not authorized where there is a conflict in the evidence of a substantial kind. A bare conflict, created by what is sometimes termed a "scintilla" of evidence, is not substantial within the interpretation of the decisions. The rule is precisely the same as that applied where a motion for judgment of nonsuit is under consideration. On such a motion it must appear that the evidence utterly fails as to

essentials necessary to be proved before an order granting the same will be allowed to stand. In *Estate of Baldwin,* 162 Cal. 471 [123 Pac. 267], the rule is declared in accordance with the announcement made in many earlier cases which are there cited, and we may add a reference to subsequent decisions: *Estate of Caspar,* 172 Cal. 147 [155 Pac. 631]; *Jacobson* v. *Northwestern Pac. R. R. Co.,* 175 Cal. 468 [166 Pac. 3]; *Diamond* v. *Weyerhaeuser,* 178 Cal. 540 [174 Pac. 38]; *Estate of Sharon,* 179 Cal. 447 [177 Pac. 283]; *Finkle* v. *Tait,* 55 Cal. App. 425 [203 Pac. 1031].

[2] The motion for a directed verdict may be made either by the plaintiff where, upon the whole evidence, the cause of action alleged in the complaint is supported and no support is given to the defense alleged by defendant, or it may be made by the defendant whenever a complete defense has been made out by uncontradicted evidence. The latter statement is called forth because of the insistence of appellant's counsel that the motion for a directed verdict is never proper as coming from a party who has the burden of proof, and applying his statement to this case, he argues that, because the defense of payment was affirmative on the part of the defendant, a verdict could not be directed by the court under any state of the evidence. This position is illogical. To illustrate: Let us suppose that after plaintiff had introduced testimony sufficient to establish a *prima facie* case, the defendant had proposed to prove payment of the obligation; assume that the plaintiff, in order to obviate the necessity of such proof of payment to be made, stipulated in lieu thereof that payment had been made as alleged by the defendant. In that state of the case, but one verdict would be legally possible, to wit, a verdict for the defendant.

[3] Looking now to the evidence, which appellant insists was of substance as furnishing a conflict on the proposition: The plaintiff testified that he did not agree that his claim for damages became settled by the arrangement made at the meeting; that the Jones and Moran pictures were not specially considered. He testified that the "reason" why he accepted the negatives was that he feared bankruptcy or an attachment against the property of defendant. A man named Brandt occupied the position of being a professed friend to both sides. He was produced as a witness for the plaintiff and testified first on the question as to damages,

giving his experience in attempting to make a sale of the
film prints. He admitted that he assisted in bringing the
parties together at the meeting of June 12th. Plaintiff
called him in rebuttal in the attempt to disprove the case
that had been made under the defendant's plea of an accord
and satisfaction. This witness admitted that the quality of
the films was discussed and that plaintiff at first refused to
make any settlement of the $9,000 bill. He was asked the
question, among others, "Now, Mr. Brandt, was there in sub-
stance and effect anything said by anybody at that meeting
that Marion Kohn would take back the 'Smiling' Bill Jones
picture and the Polly Moran pictures, and that he would
settle his claim in full against the National Film Company
by that arrangement? A. Well, now, I cannot recall the
entire incident. After the matter of the $9,000 was settled,
it practically was agreed, and that is all there was to it.
And then there was some discussion about turning back the
negatives of the Cunards—I mean of the Jones and the
Morans. The Court: What was said about that? A. Well,
there was a lot of talk at that meeting. It is quite difficult
to recall it. If I had thought it was coming up, I would
probably have made a mental note of it. But as far as I
remember it, the whole thing was based on the settlement of
$9,000. The Jones and Moran matter was not really an
issue. It was the settlement of the $9,000 in cash that Cap-
tain Rubey wanted, and I don't recall whether they decided
to give them the negatives, or whether they stayed with the
National, on the Jones and Moran. Q. (By Mr. Lederman.)
Well, Mr. Brandt, did you yourself make the proposition
that Mr. Kohn should take the 'Smiling' Bill Jones and the
Polly Moran pictures, and that he should go out and sell
those and end up everybody's claim? A. I did; I made a
lot of propositions, including that one. I said the best way
to settle the whole matter—they seemed to be at loggerheads
about the whole proposition. I said, 'The best thing to do
is to turn back the two Cunards to the National, and Mr.
Kohn take the Moran and the Jones and try to sell them
and try to get out of his' — Q. Did he agree to that, Mr.
Kohn? A. There was not any agreement on it. They
busted up in a row. I think Captain Rubey left the room
about that time. . . . Q. Well, will you add anything else,
Mr. Brandt? Will you please state anything else you can

recollect that happened at that meeting, any statements made by anybody? A. I cannot recall any specific statements made at the meeting. There was an attempt to get a settlement, particularly of the $9,000; that was the thing Mr. Kohn was asked to come down there for. The whole matter was touched on at several times, with regard to an entire settlement of the whole thing. The Court: Was anything said at that time about the fact that Mr. Kohn had already said he would not take any more of the Moran and the Jones pictures? A. That was practically all wound up at that time. They had all decided there was not going to be any more producing. The Court: What do you mean? A. Well, there would not be any more Jones produced and there would not be any more Morans produced." Plaintiff's associate Chatkin, in the course of his testimony on behalf of the plaintiff in rebuttal, was asked the following question, to which he replied in the terms stated: "The Court: In that connection, what was said about the rest of the pictures under the contract? A. Well, the Jones and the Moran pictures were discussed, as to their quality, as to the amount of money Captain Rubey claimed, the amount of money they had spent over the cost of production on those pictures, and Mr. Kohn kept insisting he was not interested in that particular phase of it; all that he wanted was pictures that could be sold, and now he was up against a loss of all of it; and there was really nothing discussed about Polly Moran and Smiling Bill Jones outside of that."

We are of the opinion that the conflict contended for was one of words only. (*Creighton* v. *Gregory*, 142 Cal. 34 [75 Pac. 569].) Under the undisputed conditions which surrounded the parties at the time, the conclusion seems irresistible that the intent was, by the acceptance by the defendant of the "Cunard" negatives and the acceptance by the plaintiff of the negatives which he had theretofore refused to receive, and the putting an end to further prosecution of any work under the contract, to finally settle all matters of difference between the parties. Had the jury been allowed to determine the issue and had it returned a verdict in favor of the plaintiff, we think it would have been the imperative duty of the court to set it aside and order a new trial. Under such a state of the case the direction as

given to the jury, requiring a verdict for the defendant, was justified.

Other answering contentions made by respondent need not be given any special consideration, for the reason that the conclusion expressed herein on the main proposition concerned in this case will not permit of a new trial being had in the action.

The judgment is affirmed.

Conrey, P. J., and Shaw, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 8, 1923.

All the Justices concurred.