[Civ. No. 15252. Second Dist., Div. Two. June 5, 1947.]

ROBERT WECK et al., Appellants, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Respondents.

[Civ. No. 15253. Second Dist., Div. Two. June 5, 1947.]

W. R. KRATKA et al., Appellants, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Respondents.

[Civ. No. 15254. Second Dist., Div. Two. June 5, 1947.]

DOMENICO TONSO et al., Appellants, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Respondents.

[Civ. No. 15255. Second Dist., Div. Two. June 5, 1947.]

GEORGE M. JAMES et al., Appellants, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Respondents.

[Civ. No. 15256. Second Dist., Div. Two. June 5, 1947.]

CLOTILDIS KERNS et al., Appellants, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Respondents.

[Civ. No. 15257. Second Dist., Div. Two. June 5, 1947.]

BRUCE H. KRATKA, Appellant, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Respondents.

[Civ. No. 15258. Second Dist., Div. Two. June 5, 1947.]

RICHARD B. REINERT, Appellant, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Respondents.

[Civ. No. 15259. Second Dist., Div. Two. June 5, 1947.]

JEAN CHURCH JAHNS, Appellant, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Respondents.

[Civ. No. 15260. Second Dist., Div. Two. June 5, 1947.]

CARL RICHARD H. MUELLER, Appellant, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Respondents.

B. J. Bradner, William L. Murphey and Stewart, Shaw & Murphey for Appellants.

Harold W. Kennedy, County Counsel, S. V. O. Prichard, First Assistant County Counsel, Roy W. Dowds, Assistant County Counsel, Loton Wells, Deputy County Counsel, Frank Karr and C. W. Cornell for Respondents.

WILSON, J.—The nine actions above entitled were commenced by plaintiffs to recover damages claimed to have been caused to their respective properties by the diversion of storm waters from what they allege to be a natural watercourse or channel known as Eaton's Canyon Wash. The actions were consolidated for trial. At the conclusion of the evidence the court directed the jury to render verdicts in favor of defendants. Verdicts were returned as ordered and judgments were entered thereon from which plaintiffs have appealed on a joint transcript.

Plaintiffs have also appealed (1) from the orders made after trial and before the hearing of the motions for a new trial determining that the Honorable Charles S. Burnell was not disqualified to have heard the actions and that he was not disqualified to hear the motions for a new trial, and (2) from the order denying the motions for a new trial. Since the orders first mentioned are not discussed in plaintiffs' briefs the appeal therefrom is presumed to have been abandoned and the orders will be affirmed. The order denying a new trial is not an appealable order and the purported appeal will be dismissed.

For brevity defendant Los Angeles County Flood Control District will be hereinafter referred to as district, defendant

Southern Pacific Company as company, defendant Southern Pacific Railroad Company as railroad, and Eaton's Canyon Wash as wash. The evidence will be more clearly understood from the appended map showing the course of the wash, the railroad right of way, adjacent streets and roads, and the location of the properties of the several plaintiffs. The map is not an exhibit in evidence. It was attached to one of the briefs for the purpose of illustration and is inserted here for the same purpose.

(This map is not an exhibit in the case. It is used in this opinion only for the purpose of illustrating the evidence.)

Approximate distances:
A to B 1500 feet
B to C 3000 "
B to D 3000 "

The approximate distances between the lettered points on the map are: From A to B, 1,500 feet; from B to C, 3,000 feet; from B to D, 3,000 feet.

The object of the actions is thus summarized in plaintiffs' brief: To recover for damages to their real and personal prop-

erty by reason of storm waters leaving the wash on March 4, 1943, "as a direct and proximate result of (1) the obstruction and diversion of the waters from said natural water channel in an artificial channel; (2) the negligent operation and maintenance of said artificial channel; (3) the improper design and careless construction of flood control works upon said natural channel; (4) the negligent operation and maintenance of said natural channel and flood control works thereon."

The statute of limitations was not pleaded by any of the defendants.

It is conceded that plaintiffs' properties were damaged by the flood waters that flowed over them, but the basic question is, as in any character of action alleged to arise from negligent acts, that of proximate cause. Did any act of defendants, or any of them, proximately cause the errant waters to flow across the respective properties of plaintiffs?

In *Baillargeon* v. *Myers,* 180 Cal. 504, 508 [182 P. 37], the court held the following to be a satisfactory definition of proximate cause: "[T]he proximate cause of an injury is that cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred; it is the efficient cause, the one that necessarily sets the other cause in operation." ■ In order to maintain an action for damages based on the wrongful act or neglect of another, it must be alleged and proved that such act was a direct and proximate cause of the injury. ■ In determining the question of proximate cause there are two separate and distinct elements that must not be confused: (1) That which causes the injury, and (2) that without which the injury would not have happened. For the former the defendant may be liable, but for the latter he may not. (*Johnson* v. *Union Furniture Co.,* 31 Cal.App.2d 234, 237 [87 P.2d 917].) ■ It must appear not only that the injury complained of was the natural and probable consequence of the negligent or wrongful act, but further that such consequence ought reasonably to have been foreseen by a person of ordinary intelligence in the light of attending circumstances, unless the act is one of wanton wrong. (Id., p. 238.)

■ Proximate cause need not be proved to the point of demonstration but may rest on reasonable inferences that

may be drawn from the evidence, provided there is proof of negligence. (*Gorman* v. *County of Sacramento*, 92 Cal.App. 656, 661 [268 P. 1083] ; *Keena* v. *United Railroads*, 197 Cal. 148, 155 [239 P. 1061].) ▮ Nevertheless the proximate cause of the damage to plaintiffs' lands will not be inferred against the district in the absence of allegation and proof of careless or defective construction or maintenance of the flood protection works installed by the district, nor against the company and the railroad unless it be shown that they committed a negligent or wrongful act or that there was a dereliction of duty on their part that tended to cause the overflow of water. (*Curci* v. *Palo Verde Irr. Dist.*, 69 Cal. App.2d 583, 588 [159 P.2d 674].)

▮ The following rules governing the granting of a motion for a directed verdict are established and will control the disposition of these appeals: (1) A directed verdict may be ordered "only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given." (2) Unless as a matter of law, when so considered, no other reasonable conclusion is legally deducible from the evidence and any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside, the court may not take the case from the jury. ▮ (3) A motion for a directed verdict concedes as true the evidence on behalf of the plaintiff, with all fair and reasonable inferences to be deduced therefrom. ▮ The fact that the court might be justified in granting a new trial if a verdict should be rendered for the plaintiff does not necessarily warrant the directing of a verdict on the same evidence. ▮ The court has no power to weigh the evidence but is bound to view it in the most favorable light in support of the plaintiff's cause. ▮ (4) The court may direct a verdict only when, disregarding conflicting evidence and giving the plaintiff's evidence all the value to which it is entitled, including every legitimate inference that may be drawn therefrom, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such verdict were given. (*Estate of Lances*, 216 Cal. 397, 400 [14 P.2d 768] ; *Estate*

*of Flood,* 217 Cal. 763, 768 [21 P.2d 579]; *Thomsen* v. *Burgeson,* 26 Cal.App.2d 235, 240 [79 P.2d 136]; *Engstrom* v. *Auburn Auto Sales Corp.,* 11 Cal.2d 64, 66 [77 P.2d 1059]; *Gish* v. *Los Angeles Ry. Corp.,* 13 Cal.2d 570, 572 [90 P.2d 792].) ▆▆▆ (5) Evidence produced by the plaintiff under section 2055 of the Code of Civil Procedure is not binding on him but on a motion for a directed verdict weighs for him as far as it is favorable and must be disregarded as far as it is unfavorable. (*People* v. *Mahoney,* 13 Cal.2d 729, 736 [91 P.2d 1029]; *Dempsey* v. *Star House Movers, Inc.,* 2 Cal.App.2d 720, 722 [38 P.2d 825]; *Smellie* v. *Southern Pacific Co.,* 212 Cal. 540, 552 [299 P. 529].)

Defendants rely on cases holding that when a motion for a directed verdict is made after the defendant's evidence has been introduced the court must consider all the evidence and should grant the motion if the evidence on behalf of the defendant has not been contradicted and has made out a complete defense, or if, upon the whole evidence, the court would be compelled to set aside a verdict for the plaintiff as wholly unsupported by the evidence, citing *Estate of Baldwin,* 162 Cal. 471, 473 [123 P. 267]; *Estate of Smethurst,* 15 Cal.App. 2d 322, 326 [59 P.2d 830]; *Ritchie* v. *Long Beach Community Hospital Assn.,* 139 Cal.App. 688, 692 [34 P.2d 771]; *Kohn* v. *National Film Corp.,* 60 Cal.App. 112, 116 [212 P. 207]; *Crouch* v. *Gilmore Oil Co., Ltd.,* 5 Cal.2d 330, 334 [54 P.2d 709], and *Blank* v. *Coffin,* 20 Cal.2d 457, 460 [126 P.2d 868]. But in these cases it is pointed out that a motion for a directed verdict cannot be granted when there is a conflict of a substantial kind; that a "bare conflict" is not substantial and that it must appear that the evidence utterly fails in the essentials necessary to be produced to prove the plaintiff's cause of action. In the Lances, Flood and Gish cases, *supra,* motions were made and granted after all the evidence for both parties had been introduced and in each case the judgment entered on the verdict was reversed.

▆▆▆ In reviewing the question whether there was such a deficiency of evidence on the part of plaintiffs in the instant action as to warrant the direction of a verdict in favor of defendants, it must be borne in mind that although a person may lawfully use such means as are necessary to confine water in its channel in order to proctect his own property (*Weinberg Co.* v. *Bixby,* 185 Cal. 87, 97 [196 P. 25]; *San Gabriel Valley Country Club* v. *County of Los Angeles,* 182 Cal. 392, 406 [188 P. 554, 9 A.L.R. 1200]) no

one has the right to obstruct or divert the flow of water from its natural channel or watercourse in such manner as to damage the property of another. (*Smith* v. *City of Los Angeles*, 66 Cal.App.2d 562, 572 [153 P.2d 69]; *Hellman etc. Bank* v. *Southern Pacific Co.*, 190 Cal. 626, 636 [214 P. 46]; *Horton* v. *Goodenough*, 184 Cal. 451, 453 [194 P. 34]; *Weinberg Co.* v. *Bixby, supra*, at p. 96.)

Defendants have misconceived the power of this court on an appeal from a judgment on a directed verdict. They have argued the case on the theory that we must decide whether from the entire evidence it can be said that they, or any of them, performed any act that caused the overflow of waters on plaintiffs' lands on March 4, 1943. To state defendants' theory in another way, would a finding to that effect, if the case had been tried without a jury, be sustained by the evidence? The evidence introduced by defendants is emphasized as showing the absence of liability on their part. We cannot consider the case in that manner. We are required to determine only whether there was sufficient evidence concerning defendants' acts or omissions, disregarding all evidence favorable to their defense, to require the submission of the case to the determination of the jury.

Governed by these rules we arrive at the consideration of the evidence, indulging every intendment and every reasonable inference favoring plaintiffs' causes of action that can be drawn and that could have been drawn by the jury from the evidence and disregarding all evidence produced by defendants favorable to their defense.

Since the acts charged against the railroad and the company are not, except in a few instances, alleged to have been committed jointly with the district and its officers, we shall consider the evidence as to each group of defendants separately in determining whether it was sufficient to debar the court from taking the case from the jury.

1. *Is Eaton's Canyon Wash a natural watercourse?* The wash has its source in Eaton's Canyon in the Sierra Madre Mountains several miles northerly from the area shown on the map and it extends to and below the area involved in these actions. During dry seasons there is no water in the wash but during rainy periods water flows from the canyon along the course of the wash for greater or less distances, depending upon the amount of rainfall. Before the territory intermediate the canyon and the area in question became settled the waters did not flow so far into the valley as they did after

the land became occupied and houses were constructed and streets were paved, resulting in a decrease of the absorbent area. The waters originating in the mountains were flood waters as distinguished from surface waters. Flood waters are those that were once a part of a stream or natural watercourse and that have escaped from it, overflowing land not usually thus covered. (*Horton* v. *Goodenough*, 184 Cal. 451, 453 [194 P. 34]; *Stewart* v. *Erskine-Bolst*, 66 Cal. App. 461, 468 [226 P. 644].) They are a common enemy against which every man has a right to defend himself. (*McDaniel* v. *Cummings*, 83 Cal. 515, 520 [23 P. 795, 8 L.R.A. 575].) Surface waters are those arising from rains, springs or swamps and not collected in a channel. (*San Gabriel Valley Country Club* v. *County of Los Angeles*, 182 Cal. 392, 398 [188 P. 554, 9 A.L.R. 1200].) Owners of property adjacent to the wash, as they were legally entitled to do (*Weinberg Co.* v. *Bixby*, 185 Cal. 87, 97 [196 P. 25]; *San Gabriel Valley Country Club* v. *County of Los Angeles*, *supra*, at p. 406), built dikes, bulkheads and other constructions in order to confine the water in its channel as a protection of their cultivated land from damage by the spreading waters. The reduction of the absorbent area and the confinement of the water in the channel caused it to flow in greater quantities into the valley progressively as the constructions increased.

A channel or watercourse may be created as the result of settlement of the adjacent territory. It is natural in the sense that it was made by the waters themselves and not by man. When it has existed for a long period of time as a channel for natural drainage of the watershed tributary to it the manner of its creation is not material and it has all the attributes of a natural channel. It is a watercourse in a legal sense although dry except in time of rain. (*San Gabriel Valley Country Club* v. *County of Los Angeles*, *supra*, at p. 397; *Chowchilla Farms, Inc.* v. *Martin*, 219 Cal. 1, 14 [25 P.2d 435].)

Defendants contend that there is no evidence that the waters of the wash reached as far south as the railroad until about 1900, when the growth of the community north of the railroad and the confinement of the water within banks constructed by the property owners caused it to flow to the area in question. We do not so interpret the evidence.

The main line of the railroad between Los Angeles and the

East was constructed in 1873. The location map by which the railroad was constructed shows a 10-foot culvert near where the Lower Azusa Road crossing is now situated. At the trial it was stipulated as facts that in 1874 an opening 10 feet wide was installed under the tracks at a point approximately 528 feet east of Lower Azusa Road; it was taken out in 1892; in 1902 another culvert 37½ feet wide was installed under the tracks at a point 35 feet east of Lower Azusa Road. The latter was in a direct line in which the wash extended from Encinita Avenue southerly. Railroad companies do not construct culverts under their tracks unless there is necessity for the passage of water. The installation of small culverts when the railroad was constructed, another in 1874, and still another at a later date gives rise to the inference that at the time the railroad was built and continuing thereafter there was a flow of water in the wash that made necessary a means by which it could pass under the railroad tracks.

M. E. Salsbury, acting chief engineer of the district, testified that the wash is a natural watercourse or channel from its source in the Sierra Madre Mountains to a point below plaintiffs' properties.

Plaintiff Albert L. Kerns, who had resided on Ellis Lane for 50 years, testified as follows: He had gone over the course of the wash up to the Sierra Madre Mountains; it is a natural watercourse extending from the mountains to Rio Hondo River (south of his property) and from there to the sea; 50 years ago it was a small ditch, 20 or 30 feet wide and 3 or 4 feet deep; at Encinita Avenue it made a turn and ran south to the railroad, through the tracks and down to Valley Boulevard; there was a culvert under the tracks 6 or 8 feet wide and the tracks were 4 or 6 feet high; in 1899 or 1900, the culvert was washed out by the storm waters and employees of the company, using company equipment, at that time installed a culvert 20 to 30 feet wide and 4 or 5 feet deep; above Encinita Avenue there was a small channel and south of Encinita the water ran over the sand flat and when it hit the track it ran through the culvert.

Eugene D. McSweeney testified that in 1897, he examined land near the area in question; the channel was 10 feet wide and 1 or 1½ feet deep at Rosemead Avenue, a short distance north of Encinita Avenue; at the latter street it was about the same size but irregular; he saw storm waters flowing in the wash on several occasions after 1897. Other witnesses testi-

fied concerning the flow of water in the wash to, through and below the railroad tracks for 40 years or longer prior to the flood that caused the damage to plaintiffs' properties.

Defendants railroad and company refer to evidence given on their behalf by their assistant division engineer and by a civil engineer employed by the Pacific Electric Railway interpreting the railroad map of 1873 as indicating a wide, shallow depression at Lower Azusa Road. They also rely on a United States Geodetic Survey map introduced by them showing the termination of the wash in 1894 at a point about four miles north of the railroad track. Defendants contend that because the latter map is official it should be declared as a matter of law that the wash was not a watercourse in 1943, when plaintiffs suffered their damage.

A legend on the geodetic map states that the surveys which it depicts were made in 1894. The topography shown on the map is not the same as of today. It is common knowledge that conditions have changed materially in the territory covered by the map during the 50 years intervening between the date of the survey and the time of the flood in 1943. Much of the area covered by the map has been subdivided, thousands of buildings have been erected, streets and roads have been paved, all contributing to the reduction of the absorbent area and to the increase of the amount of water cast into the wash. As more water entered the streambed it would naturally flow further and in increased quantities into the valley.

The overwhelming positive evidence of the witnesses who have resided in the vicinity for 40 or 50 years and during that time have seen water flowing in the wash on many occasions, the admission of the chief engineer of the district that the wash is a natural watercourse, the presence of culverts from the time the railroad was constructed, and the changed conditions since the geodetic survey was made together so completely submerge the theoretical evidence of witnesses interpreting the railroad map that there can be no doubt that the wash was and is a natural watercourse or channel that cannot be obstructed with impunity.

Furthermore, a channel or watercourse need not be an ancient one in order to render it immune from obstruction. The burden of surface waters must be borne by the owners of properties on which it originates and onto which it naturally flows by reason of the slope or contour of the land, and they are not privileged to erect barriers or

ditches that will increase the flow on neighboring lands. Nevertheless surface waters may, without artificial aid, converge so as to form a defined channel and if they would naturally flow therein it would be construed to be a natural watercourse from the point at which the channel begins to take form. Consequently whether the wash has been formed by waters arising in the mountains and flowing from Eaton's Canyon, or by storm waters originating in the territory below the mountains, or by surface waters that have naturally .converged and formed the channel, it cannot be so obstructed as to cause the water to flow where in a state of nature it would not have gone.

2. *The case against Southern Pacific Company and Southern Pacific Railroad Company.*

(a) One of the grounds of the motion for a directed verdict on behalf of these defendants was that the evidence failed to show which, if either of them, committed any of the acts or omissions complained of. During the trial no differentiation was made between the two companies. All counsel, including the attorney for the two companies, and the witnesses referred indiscriminately to ''Southern Pacific'' without specifying either company. No objection was made and no demand or suggestion was voiced that the full name of either company be designated. The motion for a directed verdict was made on behalf of all defendants by counsel for the district. He and not counsel for the company and the railroad advanced the ground of the motion under discussion. Since no distinction was made at the trial and since these defendants did not think it important to stress this ground at the close of the trial and have not argued it in their briefs, we shall consider the evidence as referring to the two companies jointly.

(b) Defendants railroad and company contend that the evidence affirmatively shows that no act was performed by either of them to divert the flow of water in the wash. They have bypassed all evidence given in behalf of plaintiffs and state that the uncontradicted evidence affirmatively shows that if any act of diversion was committed other persons were the offenders.

Their contention that the only time during the 70-year period from 1873 to 1943 when it was possible for water to flow under the railroad tracks or across the right of way was from 1902 to 1907, during which time it was stipulated that a culvert was maintained through which the water could flow, is contradicted by the evidence heretofore related, by

the location map of the railroad, and by the stipulation to which we have previously referred relative to the existence of culverts from 1873 until 1902. It was also stipulated that in 1907 the "Southern Pacific" removed and filled the culvert, and installed two wooden box culverts, each assembly being 3 feet high and 12 feet wide, at points east of Lower Azusa Road; that these two culverts were, sometime after 1907 and prior to 1936, filled up, and the roadbed and rails were raised 6 or 8 feet between Lower Azusa Road and Ellis Lane.

Albert L. Kerns, in addition to the evidence which we have outlined, testified concerning the existence of the culverts and that he saw employees and equipment of the "Southern Pacific" covering up the culverts and excavating land along the north side of the tracks as far as Ellis Lane. Mr. Kerns and other witnesses testified concerning various storms and the action of the water both before and after the culvert was filled and the excavation made along the tracks.

B. J. Bradner testified that in 1906, he drove over the channel of the wash on Lower Azusa Road; he saw the wash to the north and to the south he saw a trestle 35 feet long; at that time the wash went through the culvert under the railroad; the culvert was 30 or 35 feet wide. In 1907 Mr. Bradner saw that the railroad tracks had been raised and the culvert was gone; a bulkhead was constructed of railroad ties standing on end for a distance of 800 to 1,000 feet; there was a wash along the north side of the railroad; the ties were on the south side of the wash; there was no bank on the north side of the wash and there was no culvert under the tracks. In 1906, he did not see any channel along the north side of the railroad.

Other witnesses testified that in 1906, the storm waters of the wash went under the railroad track, and that very little water flowed along the north side of the track until 1906 or 1907, when the culvert was removed and the bulkhead made of railroad ties was installed.

Witnesses called by defendants testified concerning the erection by the owners of property south of the railroad of bulkheads and other obstructions westerly from Ellis Lane parallel with the railroad. Such evidence, they contend, effectively disposes of their liability for damage to plaintiffs' properties. This element is one that should have been submitted to the jury along with the other disputed issues in the case.

o

Prior to the diversion of the stream it flowed from point A to point B and approximately straight down the grade to point C as these points are designated on the accompanying map. There is evidence that, save for the closing of the culvert and the obstruction of the wash, the waters would have continued from B to C instead of running along the north side of the railroad from B to D where it flowed after the culvert had been filled. The gradient from Encinita Avenue to Lower Azusa Road (A to B) was 1.31 per cent. The gradient from point B to C was practically the same. The water was diverted by the closing of the culvert so that it flowed from Lower Azusa Road to Ellis Lane (B to D), where the gradient was .85 per cent.

Harold L. Conkling, a consulting engineer in hydraulics and hydrology, testified that the carrying power of flood water depends on its velocity and that the effect of a curve in a stream is to decrease its velocity and therefore its carrying capacity. The sharper the curve the more the force of the stream is absorbed in going around the curve, and the power of the stream to carry detritus is diminished, causing the deposit of detritus by the slowing of the velocity. The same result obtains when the grade has become flattened. A stream flows faster as the grade is steeper. When a deposit of detritus is made on a grade that is flatter than another portion of the streambed the velocity of the water is immediately affected upstream progressively—the deposit will gradually creep upstream. He testified that the flow of the water in the wash was slowed by two factors—the curve at point B, and the fact that the gradient from B to D was less than that from A to B. By reason of these interferences with the law of nature, said the witness, the speed of the water was slowed to such an extent that a greater amount of silt and detritus was deposited along the north side of the railroad from B to D than would have settled if the water had gone along the line A B C. When a deposit of silt begins it moves upstream, and where the grade has been changed artificially the deposit will continue upward until a restoration to an equal grade has been brought about. Mr. Salsbury, Chief Engineer of the district, testified to the same effect.

Mr. Conkling gave his opinion as an expert that if there had been no change in the channel of the wash turning it along the north side of the railroad and no embankment constructed, the water would not have turned at Lower Azusa

Road (point B) but would have gone down the steeper slope (toward point C) and the channel would have cut itself down to a grade on which it could have carried the load of water. In that event there would have been no overflow onto the lands of plaintiffs.

There is evidence that as a result of the curve and the change of the gradient detritus was deposited in the channel as far north as Encinita Avenue (point A) 4 to 5 feet in depth, practically filling it to the level of the adjacent property.

The closing of the culvert, the curve which the stream was caused to take, the turning of the water onto a gradient less than that existing above the curve, and the filling of the channel with detritus, were elements that the court had no right to remove from the consideration of the jury. It was the jury's province to consider all these circumstances in determining whether they, or any of them, caused the deposit of detritus in greater quantities than would have resulted if the water had flowed approximately in a straight line, and if so whether the deposit had backed upstream to such a distance as to fill the streambed and cause the water to depart from its accustomed channel onto plaintiffs' properties.

(c) The third and last contention of these defendants is that assuming that there was a diversion of water from a natural watercourse the evidence fails to show that any act or omission on their part was a proximate cause of the flood, and that this court should so declare. In view of the evidence which we have related concerning the physical aspects of the wash and of the territory adjacent to its intersection with the railroad right of way, the acts of these defendants in filling the culvert through which the water had passed and could have continued to pass under the railroad and in constructing an artificial channel along the north side of the railroad in which the water was compelled to flow, and the increased deposit of detritus caused by the curve in the stream and by the lessening of the gradient, the question of proximate cause of the overflow and of the resulting damage, like the other questions in issue, should have been submitted to the jury.

Under the rules which we have stated relating to directed verdicts it was the duty of the jury and not of the court to determine from the evidence whether the acts of these defendants were negligent and if so whether they were the

proximate cause of the damage, and in so doing to draw its own inferences from all the evidence.

3. *The case against the Flood Control District and its officers.* The complaints allege that about the year 1915, the district took possession of the natural channel of the wash as it then existed and at all times thereafter has undertaken to control the storm waters of the wash. The district was created by law in 1915. (Stats. 1915, ch. 755, p. 1502; 1 Deering's Gen. Laws, 1937 ed., p. 2006.) The fact is that it did no work on the wash at or near Lower Azusa Road until 1934 or 1935. At that time the culvert under the railroad had been closed and the water had been flowing along the north side of the railroad for 28 years—long before the district existed. Under the conditions which it had no part in creating and for which it was not in any manner responsible, the district undertook the construction of flood protection works along the channel from Encinita Avenue to Lower Azusa Road and thence parallel with the railroad to Ellis Lane. Obviously such negligent acts as had been performed by the railroad, the company and the owners of property south of the railroad before the creation of the district cannot be charged as negligence on its part.

The work performed by the district was in an effort to retain the flood waters within the streambed. There is no evidence that any structure erected by it diverted the water from its natural channel.

The history of the flood protection work performed on the wash by the district adjacent to the lands of plaintiffs is gathered from the testimony of the various witnesses. In January, 1936, pipe and wire protection fences with brush were installed immediately north of Encinita Avenue down to the north line of the Temple City property, the effect of which was to confine the water in that area to the extent of the capacity of the channel. The banks on the east side of the wash southerly from Encinita Avenue for a distance of 700 feet were constructed between 1934 and 1936, according to one witness and in 1938 according to another, the protection works being double pipe and wire fence. Part of this was taken out by the waters in 1938. Following this storm the banks and protection works were reconstructed to approximately their former condition, with the fence of identical height and measurement. After that storm a channel downstream from Lower Azusa Road toward Ellis Lane was excavated for a distance of a quarter of a mile. Since

that time the district has performed maintenance work on the channel at various times. The bank on the north side of this channel was approximately 10 feet high; the levees and fences were reconstructed as they had formerly existed from Lower Azusa Road up to Encinita Avenue. There was a rainfall on January 22 and 23, 1943, that damaged a section of the fence along the bank below Encinita Avenue. The fence was washed out completely for a greater part of this distance and the water cut into the sand embankments which the district had constructed.

Following the rains of January, 1943, an emergency crew of the district placed sandbags along the damaged section of the levee and fence. Within a week or two later four pipe and wire wing fences were installed along the east bank of the channel below Encinita Avenue, each approximately 50 feet long, set at an angle of 45 degrees from the bank and additional sandbags were placed. The wing fences were installed as a temporary emergency measure prior to the storm of March, 1943. They were placed along the bank and did not project out into the stream flow. Wing fences catch debris from the water and build up their own banks and slow down the water. This is first aid work and is not used as regular bank construction. The bank was reconstructed with dirt as it had theretofore existed to its original height. Following the storm of January, 1943, there was a deposit of detritus in the channel below Encinita Avenue of about two feet above the former grade of the streambed. The maximum rate of flow in the wash was approximately 2,280 second feet during the storm of January, 1943, and 1,600 second feet in March, 1943.

In 1935, the district obtained easements from the company and the railroad along the north side of the right of way, built higher fences and widened the channel. After the storm in 1934 the channel east from Lower Azusa Road was cleaned out, detritus was thrown on the bank making it much higher than formerly along the Kerns property on the north side of the wash. In 1938, the channel from Lower Azusa Road to Ellis Lane was cleaned out, the banks were made higher and wider and the channel was made wider. Some of the banks were 15 feet high. After the storm of 1938, the channel was changed to some extent toward the east near Encinita Avenue. High and expensive banks were built on the east side of the wash from Lower Azusa Road to Encinita Avenue and a riprap of wire and brush was installed for a part of that distance.

Plaintiffs contend that the structures erected by the district were improperly designed and for that reason did not retain the water in its channel. Mr. Conkling, the hydraulic engineer who testified at great length on behalf of plaintiffs, testified that if the structures had been stronger they would have resisted the water but he admitted that they did not cause the water to go out of the streambed. He stated that under the conditions existing in 1943, if there had been no flood protection work at all below Encinita Avenue the water "would have gone to about where it did go"; that the stream would have left the channel approximately at the point where it overflowed onto plaintiffs' properties; that with the curve below Lower Azusa Road as it then existed the channel would have "silted up" and the water would have flowed over the adjacent ground and would not have confined itself to a definite channel.

Mr. Conkling expressed the opinion that the wing fences were not in accordance with sound engineering principles by reason of their being constructed on a curve of the stream, the angle at which they were placed, and the length of the fence and of the wing walls, but he stated that the wing fences were a good first line of defense and that they would retard the failure in the main defenses. He was of the opinion that in this particular flood the bank and revetments were inadequate to hold the amount of flow that came in the storm of March, 1943, because the streambed had been raised below, referring to the channel along the railroad below the curve at Lower Azusa Road. His theory was that the installations were weak because (1) Encinita Avenue was paved and the pavement would tend to hold up the flow even if there had been no flattened grade below Lower Azusa Road; (2) experience had shown that the double pipe and wire revetments were insufficient at this point because they went out in January, 1943; and (3) the wing walls extended into the stream and took its force much more directly than the walls around the curve.

We find nothing in the evidence indicating or from which it can be inferred that any act of the district was a direct or proximate cause of the damage. Neither the wing walls nor any other structure installed by the district caused the water to flow out of the channel. Their mere failure to retain the water within the streambed did not constitute negligence. No inference of negligence is furnished either by Mr. Conkling's opinion that the protective works were shown to be

insufficient because they were carried out by the flood in January, 1943, and that the wing walls were not good engineering practice, or the fact that the structures did not withstand the force of the water. Nor is there an inference that the result might have reasonably been foreseen by persons of reasonable intelligence. It does not appear that the damage was the natural or probable consequence of a negligent or wrongful act on the part of the district or its officers.

Only 42 days elapsed between the January and March floods. Emergency repairs were made after the January storm. There is no evidence that the protective structures were inherently defective. ▮▮▮ No duty rested on the district to keep the water out of plaintiffs' lands, as contended by plaintiffs. The statute creating the district contained no mandatory direction to build public improvements of any particular character or design, or any improvement at all. Its failure to construct an impervious and indestructible wall along the wash was not an act constituting the taking or damaging of private property for public use for which compensation would be required. (See Const., art. I, § 14.) ▮▮▮ The overflow was the natural result of too much water in the channel. It was not caused by the acts of the district in attempting to control it.

▮▮▮ Mr. Conkling, while expressing the opinion above mentioned, admitted that wing walls were a good first line of defense. He also admitted that if no protective works had been installed the water would have gone over plaintiffs' properties exactly where it did go. His opinion, which was concurred in by defendants' witnesses, was that the closing of the culvert under the railroad, the establishing of the curve in the channel at Lower Azusa Road (point B), and the flattening of the grade from that point to Ellis Lane (point D) resulted in the deposit of silt in the channel up to Encinita Avenue. These conditions which existed when the district commenced its protective work and which had existed for 28 years previously are not chargeable to the district.

The evidence shows that if the culvert had not been closed and the stream deflected easterly along the north side of the railroad the water would have naturally flowed practically straight southerly to point C as shown on the annexed map, which was a steeper gradient than from point B to point D. In that event there would have been but little if any deposit

of detritus between points A and B. But the district had no part in altering the course of the stream. In doing the protective work it had to accept the situation as it existed when the flood protection work was commenced. It could not open the culvert which had so long previously been closed by the railroad and the company and thereby made the crooked channel straight.

The case of *House* v. *Los Angeles County Flood Control District,* 25 Cal.2d 384 [153 P.2d 950], presents a situation different from that shown by the evidence in the instant case. In the House case the district removed permeable dikes, piling, wire mesh and groins bordering the Los Angeles River adjacent to the plaintiff's land and replaced the installations with levees. The effect of the obstructions that were removed had been to reduce the high velocity of the river waters by permitting them to spread over an extensive overflow area, leaving a deposit of silt. Upon the removal of the protective structures and the building of the levees along the river banks there was no provision for the overflow to spread on adjoining lands. The result was the confinement of the waters to a smaller area and the increase of their velocity. No such acts were committed by the district along the wash. The district never provided for an overflow of the wash. All its structures were installed with a view to confining the water within defined banks. Such structures as were removed were replaced by others for the same purpose. At all times the effort of the district was to prevent a spread of the waters over the surrounding area.

The channel from B to D along the railroad had existed since 1907. In its effort in 1935, when it first undertook flood protection work, to provide a better means of carrying the water the district obtained easements from the company and the railroad, widened the channel, cleaned out the detritus, and built the banks higher. These attempts to improve the situation which it found when it entered on the scene did not make it a joint tort feasor with the company and the railroad and did not render it liable for the damages that were brought about by acts that the latter committed 28 years previously.

What we have said with reference to the district is applicable to its officers and employees. Since there is no liability on the former there is none on the latter.

4. *Alleged errors in rulings on evidence.* Plaintiffs specify five errors alleged to have been committed in sustaining

objections to evidence. Two are with reference to the liability of the district. Offers of proof were made following the orders sustaining the objections. The evidence, if admitted, would not have changed the result of the action as to the district and those objections need not be considered.

Since the case may be retried as against the company and the railroad we deem it proper to pass upon the erroneous rulings of the court rejecting evidence relating to those companies.

 (a) After Mr. Conkling, plaintiffs' expert witness, had given his testimony that the grade of the surface of the land from Encinita Avenue (point A) to Lower Azusa Road (point B) and southerly therefrom (toward point C) was 1.31 per cent and the grade from Lower Azusa Road (point B) to Ellis Lane (point D) was .85 per cent and had stated that water channels usually follow the surface of the ground, he was asked to state what the natural consequence would be of those differences of grade upon the deposit of detritus. Objection was made that no proper foundation had been laid. The question was a proper one to be answered by the witness as an expert hydraulic and hydrological engineer and a sufficient foundation had been laid for it.

(b) The same witness testified that a survey showed that the natural ground surface of Ellis Lane (point D) was 297 feet above sea level and that the elevation on a projected line of the natural channel south of the railroad at the same distance as Ellis Lane (at the point designated C) was 288.3 feet above sea level, the latter being 8.7 feet lower than the former. He was asked his opinion as to what effect a change in the channel along the northerly line of the right of way and the difference in elevation would have. An objection on the ground that the question assumed a fact not in evidence was sustained. The evidence is undisputed that the course of the channel was changed. The witnesses had already testified (1) to the fact that the gradient in the channel along the railroad was flatter than the grade where the water formerly flowed from point B to point C, (2) to the percentages of the two gradients, and (3) to the elevation above sea level of points C and D. The question was proper and all necessary facts were in evidence to justify an answer.

(c) The witness was further asked where in his opinion the waters of the wash would have flowed assuming that there had been no obstruction along the railroad right of way. An objection on the ground that the question was

incompetent, irrelevant and immaterial and no foundation laid for a hypothetical question of that type was sustained. The evidence above related furnished a foundation for the question which was appropriately propounded to the expert witness.

The judgment in favor of defendants Southern Pacific Company and Southern Pacific Railroad Company is reversed and it is affirmed as to all other defendants. The orders holding that the trial judge was not disqualified are affirmed. The purported appeal from the order denying a new trial is dismissed.

Moore, P.J., and McComb, J., concurred.

The petitions for rehearing were denied June 24, 1947, and appellants' and respondents' petitions for a hearing by the Supreme Court were denied July 31, 1947. Carter, J., and Schauer, J., voted for a hearing.